**EMPIRE GAS CORPORATION, a Missouri corporation, Plaintiff,**

v.

**AMERICAN BAKERIES COMPANY, a Delaware corporation, Defendant.**

No. 82 C 815.

United States District Court,
N.D. Illinois, E.D.

March 11, 1986.

As Amended Nunc Pro Tunc
Oct. 30, 1986.

George A. Platz, Scott Mendeloff, Sidley & Austin, Chicago, Ill., Steven G. Emerson, Thomas H. Davis, Morris, Larson, King & Stamper, Kansas City, Mo., for plaintiff.

Bernard J. Nussbaum, Robert B. Millner, Merrick S. Rayle, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendant.

## MEMORANDUM

LEIGHTON, Senior District Judge.

This is a suit in which the plaintiff alleges, and defendant denies, that a contract for the sale of goods was breached by non-acceptance and repudiation. The cause is on trial before a jury; but a dispute that has its origin in the pretrial stage of this case requires the court to resolve issues concerning the admissibility of certain testimonial evidence.

Defendant seeks to call a lawyer who will testify that during pretrial discovery the plaintiff willfully, or by gross negligence, or perhaps corruptly, withheld documents which contained statements of plaintiff's executives stating that the goods sought to be sold were "unmerchantable", "unusable", "no good", "not suitable for the American market", and "junk". Plaintiff objects on several grounds; therefore, the parties have been heard. And from the record as a whole, the court has ascertained the material facts.

I

Empire Gas Corporation is organized under the laws of Missouri with its principal place of business in Lebanon in that state; it is a seller of carburetion conversion equipment and propane gas. American Bakeries Company is incorporated in the State of Delaware with its principal place of business and general offices in Chicago, Illinois; it is a seller and distributor of bakery goods.[1] Its operations in different parts of the country involve the ownership of a fleet of trucks numbering more than 3,000. Both companies operate nationwide from depots and locations in regions within the United States.

The cost of operating trucks is a major consideration for a company like American. During the period of the "energy crisis" of the late 1970s, Empire sold carburetion conversion equipment that enabled a truck fleet owner, like American, to convert trucks from the use of gasoline to operation on propane. Propane gas generally costs two-thirds the price of gasoline. American became interested in a program of converting its trucks to the use of propane gas. Empire learned of this fact; and early in 1980, Floyd Waterman, a salesman for Empire, communicated with Roy V. Anderson, director of transportation for American and began negotiations for the sale of carburetion conversion equipment by which American would convert its fleet of trucks to the use of propane. As a result, Waterman and Anderson met a number of times, discussed details of an agreement, and finally, on or about April 17, 1980, entered into a contract by which Empire was to sell American approximately 3,000 conversion units "more or less depending upon requirements of Buyer." In addition, for a period of four years, American, subject to certain other conditions, agreed "to purchase propane motor fuel solely from Empire at all locations where

---

1. In the balance of this Memorandum, and for literary convenience, the plaintiff Empire Gas Corporation will be referred to as "Empire", and the defendant American Bakeries Company as "American".

Empire has supplied carburetion and dispensing equipment...."

This contract did not specify what make or brand of conversion equipment Empire was to sell; nor did it give the date when American was to begin making the purchases contemplated by the parties.[2] However, when Waterman talked with Anderson about the carburetion equipment, the only sample he displayed, and the only equipment Anderson examined or had the opportunity to see, was a black Be' & Be' Model S vaporizer that was manufactured in Holland, and imported into this country by Empire for sale to its customers. Empire had in its inventories a number of brands and makes of carburetion conversion equipment such as Impco, Century, Algas, Garretson, and others. The contract did not warrant or guarantee performance of the conversion units which Empire was going to sell to American; but Empire had a ninety-day warranty on all conversion equipment it sold to customers, without reference to make or brand. As to the date when the purchases were to begin, Waterman proceeded on the assumption that within a reasonable time after the contract was executed, American would begin converting its trucks and buy the carburetion conversion units, depending on its requirements.

Consequently, Waterman called Anderson to inquire when the purchases of the conversion equipment would begin. Anderson said that American was experiencing budget problems; and he was involved in the task of straightening out his inventory. He assured Waterman that as soon as he had taken care of the details, the purchase orders would be put in. Waterman accepted these explanations; and through the balance of 1980, he periodically communicated with Anderson and received the same kind of response. These contacts, only by telephone, continued into the following year when on March 3, 1981, Waterman

called the offices of American and spoke with Robert Kearns, the assistant director of transportation, who told him that Anderson had died the night before. Kearns assured Waterman of his intent to carry on the representations Anderson had made concerning the contract. Thereafter, representatives of Empire continued telephonic contacts with responsible officials of American until sometime in July when they were informed that the contract would not be performed. In none of these communications was there any discussion about the brand or make of the gasoline conversion equipment American was going to purchase from Empire.

In fact, from the date the contract was signed by the parties, and until Empire was told that the agreement would not be performed, there was no discussion about the Be' & Be' conversion equipment. On March 24, 1980, Empire had entered into an agreement with a subsidiary of the Dutch manufacturer for the purchase of more than 4,000 Be' & Be' kits. At the outset, Empire began experiencing difficulties with the workmanship and merchantability of the units. As a result, its executives wrote letters, sent telexes, and made memoranda for their files. Consequently, there was generated a considerable number of documents, many of them containing expressions, opinions, and views of Empire agents and executives concerning the usability and condition of the Be' & Be' kits.

Even before Anderson's death, Empire began negotiations with the Dutch company for the return of the Be' & Be' equipment. While these were in process, the United States Customs Service served notice of its intention to increase the tariffs it was going to impose on the conversion equipment that had been imported from Holland. This notice also generated documents containing expressions by Empire executives concerning the unmerchantabili-

2. Although the corporations in this case had a combined total sales in 1980 of almost one billion dollars, and the contract in question had a potential of more than $5 million in sales, the agreement was prepared by two laymen, Waterman for Empire and Anderson for American. It is not clear from the record to what extent any lawyer for either corporation contributed to the drafting of the contract.

ty, the inadequacy of the Be' & Be' units for the domestic market; and in at least one instance, an Empire executive expressed the opinion that the Be' & Be' equipment was "junk". In its contacts with American seeking performance of the contract, Empire did not disclose the difficulties it was having with the Be' & Be' units, a sample of which was seen by Anderson before he signed the contract of April 17, 1980. Empire invoiced American for the 3,000 carburetion units on July 9, 1981, which with sales tax, totaled $2,320,-312.50. No affirmative response came from American. It did not explain its unwillingness to go ahead with the contract; it did not accept or purchase any carburetion equipment from Empire. This suit was filed on February 10, 1982.

A little more than a year later, February 15, 1983, American made its first documents request. In one paragraph it asked for all documents which related to the merchantability of the carburetion units that had been referred to in a demand letter Empire sent before it filed this suit. The request was answered with Empire making no objection to production of the "merchantability" documents. Thereafter, American moved to compel production; but no reference was made to that paragraph of the request that demanded documents related to merchantability of the carburetion units.

On April 8, 1983, because it was evident that the parties were going to be involved in extensive discovery controversies, this court referred this cause to a magistrate who was to supervise discovery and enter all orders required by such proceedings. The matter was assigned to Magistrate Carl Sussman. Then on June 16, 1983, Empire's local counsel wrote to a lawyer for American saying, "I can state that this transmittal completes all relevant data Empire is presently aware it has concerning the entire lawsuit." No particular mention was made to any document that referred or related to merchantability of the units involved. However, following a period of more than six months, a lawyer for American wrote to Empire's local counsel on Jan-

uary 30, 1984 and told him that "we have ascertained through investigation that you have withheld from production a number of documents, many of which damage your case." The documents referred to included a letter written by Empire's president, concerning the Be' & Be' equipment, and saying that "[o]ur company has suffered losses and damages due to the failure of the equipment in not performing as warranted." Evidently, American, through its own efforts and investigations, had learned about at least some of the documents it was demanding that Empire produce.

A day or so after this letter was written, counsel for Empire responded, acknowledged receipt of the charge "that Empire records are being withheld ..."; and assured the lawyer for American that the matter "is being explored at Lebanon, Missouri [Empire's headquarters] and you will hear further from me." But the letter went on to demand that American deliver to Empire all of the documents described in the January 30, 1984 letter, and which according to American, Empire was withholding from production. Thereafter, the parties branched out into a series of demands and counterdemands for production of documents, each side making motions to compel production, and each accusing the other of violations of the discovery rules. American made three more requests for production of documents; Empire, in its answers claimed some of the documents were privileged, and others were subject to the fault that the requests were overly broad and extended the limits of proper discovery for this case. Magistrate Sussman heard the parties and entered orders granting either in whole or in part the motions to compel made by Empire and some made by American. In one instance he granted a motion by American for sanctions against Empire; this court affirmed Magistrate Sussman's order. However, the discovery dispute that led to the sanctions was not about the "merchantability" documents which the lawyer for American had described in his letter of January 30, 1984.

Magistrate Sussman ended his term of service as a federal judicial officer late in 1984; and in January 1985, this cause was assigned to Magistrate Joan Gottschall, who proceeded to supervise the discovery disputes in which the parties were still embroiled. On February 13, 1985, under an agreement by the lawyers, she ordered that on or before March 15, 1985, the parties deliver to each other all documents previously requested but had not been produced. This order was complied with by Empire; and from three major locations, including its national headquarters in Lebanon, Missouri, it turned over to American all the documents that had been requested. These included all documents concerning the Be' & Be' equipment. The court later set this case for trial to begin on February 10, 1986.

While the parties were preparing for trial, with this court conducting pretrial conferences with the lawyers, American filed a motion before Magistrate Gottschall asking her to impose sanctions on Empire for its failure to have produced at a time earlier than March 15, 1985 the "merchantability" documents which had been the subject of American's first document request of February 15, 1983. Magistrate Gottschall scheduled the filing of briefs; and on February 6, 1986, she ruled that American's motion should be granted because Empire had failed to produce the requested documents either willfully or as the result of gross negligence. Her detailed memorandum was actually received by the lawyers while this case was on trial. Empire immediately gave notice of its intention to seek a stay of Magistrate Gottschall's ruling and proceed with an appeal. On March 11, 1986, while the case was still on trial, the parties entered into an agreed order giving Empire 20 days after completion of the trial to move this court for reconsideration of Magistrate Gottschall's ruling. The order was entered, the effect being that the ruling was stayed until this court's reconsideration pursuant to 28 U.S.C. § 636(b)(1)(A).

The trial of the case proceeded, the court having admitted in evidence all of the "merchantability" documents after ruling that they were relevant to issues of fact which the jury had to resolve. Empire completed its prima facie case; American put on its defense; but as its last witness, it proposed to call the lawyer who on its behalf had gone to Lebanon, Missouri on March 15, 1985, and received the documents Magistrate Gottschall had ordered produced. When Empire's trial counsel inquired, a lawyer for American disclosed that the purpose of calling this lawyer was to show the jury that for more than two years Empire had withheld production of the "merchantability" documents either willfully, or by gross negligence, or perhaps corruptly.

## II

American argues that the lawyer should be permitted to testify so that the jury will learn how, during discovery, Empire, for more than two years, failed to produce documents which show that some or all of the Be' & Be' equipment it had proposed to sell to American was defective; and that, in the language of one Empire executive, was "junk". American insists that this failure to produce was either willful, the result of gross negligence, or was done with corrupt motives. The latter possibility, according to American, is shown by the fact that while the documents were being requested from Empire, its executives, and in some instances, its lawyers, misrepresented facts concerning their existence, and engaged in procedural devices aimed at impeding their production, in violation of American's rights to discovery. It is insisted by American that since the documents have been ruled to be relevant by this court, the failure of Empire to produce them should be provable just as American would have been allowed to show the jury that Empire had either suppressed the documents or destroyed them prior to trial.

Empire objects to the testimony of the lawyer on three grounds. First, it argues that the documents in question were in fact produced almost a year before this case

was called for trial; therefore the general rule governing the showing of suppression or destruction of evidence does not apply in this case. Second, Empire contends that whether the documents were withheld willfully, or by gross negligence, or perhaps corruptly, are questions yet to be answered by this court on review of the magistrate's order that resulted in their production. Third, and in any event, even if this testimonial evidence were admissible, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, or waste of time in the trial of this case. Therefore, the issue to be resolved is whether, under all the circumstances of this controversy, the lawyer-witness, as proposed by American, should be allowed to testify before this jury.

### III

### A

It should be noticed that this is not a case in which one party so suppressed documents that they were not available to the opponent in preparation for trial or for use in support of a claim or defense. If such suppression had been engaged in by Empire, at least with the acquiescence of a superior officer, evidence of such conduct would have been admissible because,

> As might be expected, wrongdoing by [a] party in connection with his case, amounting to an obstruction of justice is also commonly regarded as an admission by conduct. *McCormick On Evidence,* § 273 at 660 (2d ed. 1972).

Evidence of this kind would be admitted generally and not just as to the issue on which the suppressed documents would bear. And the jury should be instructed accordingly. *Lubbers v. Norfolk & Western Ry. Co.,* 118 Ill.App.3d 705, 711–12, 73 Ill.Dec. 937, 942, 454 N.E.2d 1186, 1191 (1983).

Also, it should be obvious that this is not a case in which a party has either suborned or committed perjury as a means of bootstrapping a claim or defense. If Empire had engaged in such conduct, evidence about it would have been admissible from which it could be inferred that its claim was unfounded. *See McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 921 (3d Cir.1985). Finally, this is not a case in which a party did not answer interrogatories fully, did not reveal the name of a crucial witness, did not produce vitally important documents until the day of trial, and the responsible agent of the party was called to be cross-examined about his conduct and its relation to relevant admissible evidence. If American's reasons for calling the proffered lawyer were to prove this kind of conduct by Empire, the testimonal evidence would have been relevant. *LeMaster v. Chicago Rock Island & Pacific R. Co.,* 35 Ill.App.3d 1001, 1010, 343 N.E.2d 65, 74 (1976); *see* 2 Wigmore, *Evidence* § 285 (Chadbourn Rev.1979).

In this case, the documents which American had requested Empire to produce were in fact turned over almost one year before trial began. Thus, American had available to it all of the documents in question, for trial preparation and use in defense. Indeed, from the outset of the request for production of these documents, American had most of them in its possession. There is strong suggestion in the record that the lawyers for American knew and understood their relevancy and pertinency even before Empire and its lawyers had done so. Moreover, on the day this case was called for trial, the court admitted in evidence all of the so-called "merchantability" documents, many of them over Empire's objections.

As a result, American had evidence from which it could argue its contentions and seek to prove its defense to Empire's claim of breach of contract. How the documents were obtained, for what period, and to what extent they were withheld by Empire during discovery, are irrelevant in this case. The proof by American of its defense that Empire was not able to perform the contract into which the parties entered on April 17, 1980, could be discerned not

from the method by which the documents were obtained, but rather from their content. Therefore, because of the particular facts of this case, the general rule that a party's failure to produce documents is conduct that can be evidence is not applicable. *Cf. United States v. Esposito*, 771 F.2d 283, 286 (7th Cir.1985); *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985); *see McCormick on Evidence*, § 273 at 808 (3d ed. 1984).

### B

Furthermore, this discovery dispute and the issues concerning the documents in question, have not been resolved; they are pending on an appeal by Empire that this court reconsider Magistrate Gottschall's ruling, and necessarily, her findings relative to the circumstances under which the documents were withheld. 28 U.S.C. § 636(b)(1)(A), which will control the procedure, provides that "[a] judge of the court may reconsider any pretrial matter under this subparagraph ... where it has been shown that the magistrate's order is clearly erroneous or contrary to law." As it has been construed by the court of appeals for this circuit, this statute authorizes the court to satisfy itself that the actions of a magistrate are fair and proper by receiving additional evidence, or conducting a full review. *United States v. Frans*, 697 F.2d 188, 191–92, n. 3 (7th Cir.1983). Apparently, because of the broad discretion this court has in reconsidering the magistrate's ruling, American's trial counsel conceded during oral argument that within the realm of possibilities, this court may conclude, from the evidence and the law, that Magistrate Gottschall's ruling was clearly erroneous or contrary to law. In that event, if the proposed lawyer-witness testifies and the jury returns a verdict in favor of American after drawing adverse inferences against Empire, the only way this could be corrected would be through the grant of a new trial, thus nullifying all the work done in the case. This result would be unfair to the parties and to the public; it would be a plain violation of the principle to which this court is bound, that the rules it applies "be construed to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1; *see Markham v. Holt*, 369 F.2d 940, 943 (5th Cir.1966).

### C

This should be all that need be said concerning the propriety of allowing the proposed lawyer-witness to testify before this jury. However, American insists that this testimony is relevant and should be allowed because the lawyer will tell the jury how Empire through its its executives, and in some instances its lawyers, withheld the "merchantability" documents for more than two years; and in addition, according to American, they made false representations concerning the availability of the documents.

■ But assuming all of this is to be true, Fed.R.Evid., Rule 403, provides that

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Therefore, even though the proffered testimonial evidence may be technically relevant under the broad definition of this rule, it may be excluded if it would be confusing, unduly unprejudicial, or involve undue inquiry into collateral matters. *Rhodes v. Michelin Tire Corp.*, 542 F.Supp. 60 (D.C. Ky.1982). In determining the admissibility of evidence, a court must balance its possible relevancy or probative value against traditional countervailing factors, such as the danger of unfair prejudice, confusion of issues, misleading the jury, undue delay, waste of time, and needless presentation of cumulative evidence. *Belmont Industries, Inc. v. Bethlehem Steel Corp.*, 62 F.R.D. 697, 707 (D.C.Pa.1974). And as the court of appeals for this circuit has held, balancing of the probative value and the unfair prejudice of evidence is within this court's discretion. *United States v. Serlin*, 707 F.2d 953, 959 (7th Cir.1983).

■ The term "unfair prejudice," within the context of Rule 403, means undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. *Depew v. Hanover Ins. Co.*, 438 F.Supp. 358, 360 (E.D.Tenn.1977); *cf. United States v. Grassi*, 602 F.2d 1192, 1197 (5th Cir.1979). Generally, it is said that the danger of unfair prejudice in the admission of evidence always exists where it is used for something other than its logical probative force. Here, American wants the testimony of its lawyer-witness, not to prove it did not breach the contract in question; rather, to show what it calls despicable conduct of Empire during the discovery phase of the case. It is clear that it was not the condition of the Be' & Be' units that led American to repudiate its contract with Empire; indeed, American did not know any of the facts contained in the "merchantability" documents at the time it decided not to perform the contract at issue. Therefore, injection of Empire's pretrial conduct into this record is, apparently, for an emotional reason: to show the jury that Empire, its executives, and its lawyers are bad people because documents American requested were not turned over promptly, or at least as promptly as American now insists should have been the case. *Cf. All Am. Life & Cas. v. Oceanic Trade A. Council I.*, 756 F.2d 474, 479 (6th Cir. 1985).

Empire does not concede there is any validity to American's arguments concerning these documents. Through its trial counsel, in open court during these proceedings, it has asserted that throughout this controversy, American's requests for production of documents were resisted on grounds recognized by the rules of discovery. Further, Empire contends that in the reconsideration of Magistrate Gottschall's ruling by this court, it will show, as it did before her, that the withholding of the documents, to the extent the magistrate found this was willful, is reasonably explained by a failure of communication among its corporate executives who were at national headquarters in Lebanon, Missouri; its local counsel here in Chicago; the

bonding company lawyer whose offices were in Miami, Florida; and its trial counsel located in Kansas City, Missouri.

■ It is understandable that jurors do not know, nor are they expected to appreciate the rules of discovery. Consequently, if American's proffered lawyer-witness were to testify, Empire, under any concept of fairness, would be entitled to call its witnesses to explain how discovery rules function, and how, in this case, they impacted on the discovery disputes in which the parties were embroiled in the pretrial phase of this case. In the process, these proceedings will become enmeshed in one of the pitfalls Rule 403 is designed to prevent: confusion of the issues and misleading of the jury. The principal issue this jury is being asked to resolve is whether Empire, with the ability to perform, had a contract with American that was breached by nonacceptance of the goods sold, and by repudiation. The testimony of the lawyer-witness has the potential of diverting the jury's attention from this issue to questions concerning compliance with the rules of discovery.

It is elementary that a court must assess proffered evidence in order to determine whether it would lead to a confusion of the jury. *Jamison v. Storer Broadcasting Co.*, 511 F.Supp. 1286, 1294 (E.D.Mich. 1981); *see Ellis v. City of Chicago*, 667 F.2d 606, 611 (7th Cir.1981). This court has made the necessary assessment; it concludes that whatever probative weight the proffered testimonial evidence may have is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *Cf. Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 676 (7th Cir.1985). For these reasons, he will not be permitted to testify. This is the court's ruling.

So ordered.