**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Thomas Norman BROOKS,**
**Defendant-Appellant.**

**No. 85–4552.**

United States Court of Appeals,
Fifth Circuit.

April 2, 1986.

Rehearing Denied June 2, 1986.

---

**10.** *See Ruckelshaus,* 103 S.Ct. at 3275 n. 1.

Boyce Holleman, Michael B. Holleman, Gulfport, Miss., for defendant-appellant.

James Tucker, Asst. U.S. Atty., George Phillips, U.S. Atty., Jackson, Miss., for plaintiff-appellee.

Before GEE, GARZA and HIGGIN-BOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Thomas Norman Brooks was convicted of conspiracy to violate 18 U.S.C. § 1951(a) (interference with commerce by threats or violence) by a jury in the district court for the Southern District of Mississippi, and was sentenced to nine years in the federal penitentiary. At the time of the alleged conspiracy, Brooks was President Pro Tem of the Mississippi Senate. On appeal, Brooks complains that the trial judge improperly restricted the scope of his cross-examination of the key prosecution witness; that the prosecutor impermissibly questioned Brooks about his silence and commented on Brooks's credibility; and that the court wrongly denied a jury request in the absence of the defense. After considering each of the points raised by Brooks, we affirm.

I'

A verdict will be sustained if there is "substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We present the facts in accordance with that standard.

Brooks had been serving in the Mississippi legislature for nearly thirty years when the Mississippi Horse Racing Association,

through its president, James Newman, and its treasurer, Keith Douglas, asked his advice regarding a bill to legalize pari-mutuel betting in Mississippi. Brooks told them that it would be more difficult to obtain approval from the House of Representatives than from the Senate, and that the MHRA should start with the House. After H.B. 434 passed the House, the MHRA returned to Brooks for counsel regarding Senate passage. Brooks introduced Newman and Douglas to Robert Houston, a close friend who knew many senators, with the advice that they follow Houston's lead.

In a separate meeting, Houston told Douglas that three $1000.00 MHRA membership certificates and $16,000.00 in cash should get the bill through the Senate. Douglas disclaimed authority to commit the MHRA to payment and took the proposal to Newman. Sometime thereafter, the directors of the MHRA proposed to substitute an additional sixteen $1000.00 certificates for the cash and to issue the certificates to Houston as payment for work as a "lobbyist." Newman met briefly with Brooks to make sure that the payment would secure passage of the bill and later delivered the certificates in blank to Houston. Unknown to Houston, Newman was taping their meetings.

On February 14, 1985 the bill failed in the Senate. Houston told irate MHRA representatives that a couple of senators had double-crossed them and said it was going to take cash to get the job done. Houston discussed with Brooks the payments necessary for reconsideration of the bill, and then phoned Newman, saying it would take $20,000.00 up front and an additional $30,-000.00 when the bill passed the Senate to get the bill through the governor's office.

Newman sought the aid of the FBI and was told to meet with Brooks, record the conversation, and determine whether this was an attempted extortion. Newman did so, and according to the transcript of the conversation that was admitted into evidence, told Brooks that he had a present for Houston. Newman testified that Brooks told him not to speak too loud and Brooks told him not to speak too loud and then called Houston to tell him that Newman had a package for him.

Newman met with Houston and told him that an associate had the money and that Houston could get it later that evening. After instruction from the FBI to make certain of Brooks's involvement, Newman met him in a car, again wearing a body recorder. Brooks stated that he would be able to win in the Senate with the "information" that he then had. Newman testified that by "information" Brooks meant "money."

Arrangements were made for Houston to pick up the money from Newman at 5:00 a.m. the following day, February 21, 1985. When Newman gave the money to Houston the next morning, FBI agents approached them. Houston was not arrested, but was advised to see his lawyer and then to contact the U.S. Attorney's office.

After discussions with his lawyers and the prosecutor, Houston and his attorneys signed a Memorandum of Understanding. The agreement specified that in exchange for Houston's full cooperation, the government would seek only a six-month sentence on a single count in this case, and would not prosecute him for any other illegal activities covered by the agreement. After signing the agreement, Houston was wired and told to meet Brooks, talk about money, and give him a plain paper sack containing $15,000.

Houston met Brooks later that same day in a local hotel bar. There was some talk of money, but its meaning was hotly disputed at trial: the government argued that the talk covered an illegal payment by the MHRA, while Brooks asserted that they were discussing a loan he previously arranged with Houston. After finishing their drinks, they went to Houston's car where Brooks received the money, and Houston drove away. As Brooks crossed the parking lot, the FBI met him and asked what was in the sack. After Brooks denied knowledge of the sack's contents or even where it came from, the agents gave Brooks the prosecutor's telephone number and suggested that he contact him.

Brooks then gave the money to the agents and was allowed to leave. Brooks never explained the source of the money or told the FBI that it was simply a loan from Houston. At no time was he taken into custody or placed under arrest.

The FBI hoped that Brooks might join its efforts, as had Houston, to catch other senators who might be involved, but Brooks did not respond to this invitation and was arrested at his office one week later. The resulting indictment charged Brooks with conspiracy and attempt to interfere with commerce by extortion in violation of 18 U.S.C. § 1951; the attempt charge was later dropped, and Brooks was tried only on the conspiracy charge.

## II

Brooks complains that his cross-examination of Houston was improperly curtailed when he was not permitted to ask Houston about all offenses possibly included in his plea agreement. Brooks further complains that the government did not disclose the full reach of the agreement and that the agreement itself was not timely given to him.

At trial, Brooks's counsel interrogated Houston as follows:

Mr. Holleman [Brooks's counsel]: Mr. Houston, in looking at the Memorandum of Understanding, ... I notice that it contains the language here about your cooperation—regarding the community and cooperation of any and other all illegal activities of which you have knowledge, in addition to this incident that's on trial.

Houston: Yes, sir.

Mr. Holleman: Have you previously been questioned by the FBI on other matters?

Mr. Tucker [prosecutor]: To which I object, Your Honor. How is that relevant?

Mr. Holleman: If Your Honor please, I think we filed a motion and asked that the Government tell us if he had been previously questioned or if there had been a matter pending by the FBI that I think we're entitled to know, [w]hat's

included in this Memorandum of Understanding other than this.

Mr. Tucker: I don't know what he's talking about, Your Honor. I object. It's not relevant to ask him about anything other than what's at issue before the court now.

The Court: I'll sustain the objection.

Mr. Holleman: Would Your Honor permit me to make a proffer on that at the proper time?

The Court: Yes, sir.

Brooks's counsel then moved to another area of examination without attempting to elicit information about Houston's cooperation with the FBI concerning other crimes. Immediately before the government rested its case in chief, Brooks made his proffer. He stated that he had not been allowed to pursue his line of questioning to determine whether Houston had been "questioned by the FBI or the IRS regarding other crimes prior to this incident which is on trial." Counsel explained that this was relevant because the plea agreement between Houston and the government "specifically includes all other knowledge of other crimes for which we deem appropriate to have granted to that witness immunity from anything that he may have been under investigation for by the FBI in the past. To that inquiry the government objected ... and we now have that proffer in the record...."

■ Brooks's argument that he was denied a fair opportunity to cross-examine Houston is premised upon a basic misreading of the plea agreement. Houston did not receive immunity for any crimes about which he had knowledge or even those that the government may have investigated. Rather, the plea agreement granted immunity from prosecution for illegal acts regarding which "Houston voluntarily and completely discloses all information and knowledge that he has. Should he not voluntarily and completely disclose, then as to that matter, the government is free to seek prosecution of him." Brooks's able counsel conducted a detailed and thorough cross-examination. That he did not ask

Houston what he had told the government about other criminal acts was hardly an oversight, and the court certainly did not foreclose his opportunity to do so. Counsel wanted to put before the predominantly black jury evidence that the FBI had questioned Houston about the burning of a black church near his home. The district court correctly sustained the objection to questions about any such FBI investigation. In the absence of proof that Houston fully cooperated with the FBI's investigation of the burning, such investigation was outside the scope of the plea agreement.

■ We find no merit in the argument that the government did not timely disclose to Brooks its full agreement with Houston. While the government did not comply with Brooks's discovery requests until ordered to do so by the court, Brooks received the Memorandum of Understanding well before the trial began. Relatedly, Brooks argues that the government violated the rule of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), apparently by not disclosing the full extent of the agreement's coverage. The record contains no evidence, however, that Houston received any immunity that was not disclosed. We conclude on this record that before the trial the government submitted to Brooks its full agreement with Houston and that Brooks had ample time to consider it in preparing his defense.

### III

■ During the prosecution's rebuttal argument, the prosecutor told the jury that he was embarrassed when Brooks testified and that he did not believe Brooks was credible. Brooks argues that the argument was improper and prejudicial. No objection was made at the time of the argument, however, and thus we test the statement under the plain error standard. When applying the plain error rule, a reviewing court can properly evaluate a case only if it views the claim of prejudice against the entire record. *United States v. Young*, — U.S. —, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). We do so here.

■ In his closing argument, Brooks's counsel not only attacked the credibility of the prosecution witnesses, but he said that Brooks told the truth while he was on the stand, impermissibly vouching for the credibility of his client. In rebuttal, the prosecutor told the jury that he did not want to tell them what they should think, but as for himself he was embarrassed by the story told by Brooks. The Supreme Court has held that "if the prosecutor's remarks were 'invited' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Id.* 105 S.Ct. at 1045. Viewed in the context of comments made by defense counsel, the prosecutor's initial response, though improper, was not so prejudicial as to undermine the fundamental fairness of the trial. Brooks has not demonstrated any plain error regarding reversal.

### IV

Brooks argues that the trial court erred in not granting him a mistrial after the prosecutor questioned him about his silence during his first encounter with the FBI and his later silence before trial. Brooks here argues that the FBI took him into custody in the parking lot, that he had not been given the *Miranda* warnings, and that the fact of his silence was therefore inadmissible against him. Alternatively, Brooks argues that even if he were not in custody, this line of questioning was more prejudicial than probative and should therefore have been excluded.

When Brooks was stopped by the FBI, he offered no explanation for the large sum of money he carried in a paper sack, a rather curious circumstance. His silence continued until trial. The prosecutor asked Brooks about that silence during cross-examination, but Brooks's objection stopped the questioning when it reached Brooks's silence between the time he left the FBI agents and the trial, and the jury was instructed not to consider Brooks's intervening silence in its deliberations.

Brooks was indisputably not in custody when the FBI first stopped him. He was not placed under arrest, he was free to leave, and he did not have to engage in conversation with the officers. The argument that taking his sack of money evidenced custody is refuted by Brooks's own testimony that he offered the sack to the FBI as soon as they identified themselves.

■ Brooks relies heavily on *United States v. Henderson*, 565 F.2d 900 (5th Cir.1978), for the proposition that even if he were not in custody, the use of his silence as evidence is impermissible because its prejudicial effect outweighs its probative value. The passage cited by Brooks, however, states that the "silence of an accused who has not been given a *Miranda* warning cannot be used against him to impeach his credibility, *unless his silence is inconsistent with his innocence and inconsistent with his exculpatory statement given at trial.*" *Id.* at 905 (emphasis added). Here, Brooks took the stand in his own behalf and testified that the money represented a loan he had previously arranged with Houston. His silence regarding the loan, and his denial, when stopped, that he knew that money was in the bag, are inconsistent with his testimony and innocence. The cross-examination was proper and the trial court did not err in not granting a mistrial. *Cf. Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971) (statements obtained in violation of *Miranda* admissible for impeachment purposes).

## V

Finally, Brooks complains that the trial court erred in answering a question from the jury when Brooks and his counsel were absent. He further urges that the jury's request to see a transcript of both Brooks and Houston's testimony was improperly denied.

After being instructed by the judge, the jury retired to deliberate at about 4:00 p.m. At about 7:00 p.m. it sent a note to the judge requesting copies of Brooks and Houston's testimony. The judge, without consulting counsel, replied that such copies were not available and that the jury would have to rely on its own recollection of the testimony presented to them during the trial.

■ We agree that the judge ought to have conferred with counsel before answering the request for the transcripts, but the error was harmless. In *United States v. Breedlove*, 576 F.2d 57, 60 (5th Cir.1978), we held that if the judge is distinctly responsive to the jury's inquiry, the response clearly states the law, and the defendant does not show any prejudice, then the error in responding to the jury in the absence of the defendant does not require reversal. Here the judge's answer was responsive to the request.

■ Brooks concedes that the abuse of discretion standard governs the question of whether the trial court erred in not allowing the jury to examine the transcripts of Brooks and Houston's testimony. At the time of the request no transcripts were yet prepared; oral argument indicated it would take at least two days to prepare them. Both Brooks and Houston had recently been on the witness stand, and the trade-off between waiting for the transcripts and the jury's fading recollection of the witnesses with the passing of time may well have persuaded the trial judge to deny the request. Under these circumstances, the trial judge did not abuse his discretion in not halting the jury's deliberations to await transcripts of testimony.

AFFIRMED.