**Reginald SILVERNAIL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Nos. A–1914, A–2561.**

Court of Appeals of Alaska.

July 21, 1989.

---

Larry D. Card and David E. George, Anchorage, for appellant.

W.H. Hawley, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Reginald Silvernail was convicted by a jury of murder in the second degree and kidnapping. Acting Superior Court Judge Michael N. White sentenced Silvernail to concurrent terms of seventy-five years with twenty-five years suspended. Silvernail later moved for a new trial, alleging newly discovered evidence. Superior Court Judge Mark C. Rowland denied the motion. On appeal, Silvernail contends that insufficient evidence was presented to support his convictions and that the trial court erred in allowing the prosecution to question him about his failure to make a statement to the police officers who arrested him. Silvernail additionally argues that his sentence is excessive. Finally, Silvernail claims that the court abused its discretion in denying his motion for a new trial. We reverse.

The body of Kurt Gilruth was discovered on April 8, 1986, at the bottom of a high bluff on the outskirts of Anchorage. Gilruth had been severely beaten with a blackjack, shot once in the head, and pushed off the edge of the bluff. Al-

though the injuries that Gilruth received were not in themselves fatal, they interfered with his body's ability to produce heat, and Gilruth died of hypothermia within several hours of being pushed over the bluff.

Investigation of Gilruth's death led the state to charge Silvernail with first-degree murder, kidnapping, and first-degree assault. Two other men were charged as codefendants: Richard Holland and Robert Hughes. The state's evidence indicated that Silvernail, Holland, and Hughes attended a party at a friend's apartment in Anchorage on the night of April 7, 1986, and became involved in a dispute with Gilruth. According to the state's theory of the case, the three men forced Gilruth to the parking area outside the apartment. There, they beat and kicked him until he was semi-conscious. They then loaded him into Hughes' van. Hughes drove the van to the outskirts of Anchorage, with Silvernail in the passenger seat. Holland was with Gilruth in the back. During the drive, Gilruth was shot in the head. Upon arrival on the outskirts of Anchorage, Gilruth was still alive and moaning. The three men unloaded him from Hughes' van and kicked him over the edge of a bluff. They then drove back to Anchorage.

After stopping for a change of clothing, Hughes, Holland and Silvernail drove to a Safeway supermarket. There, Holland was stopped for shoplifting by a store employee. After Holland began to fight with the employee, police officers intervened. As they were attempting to subdue Holland, Hughes and Silvernail ran from the store, got into Hughes' van, and attempted to flee. Other officers pursued Hughes' van and managed to stop it in the parking lot of a nearby apartment building. An officer immediately handcuffed and arrested Hughes for driving while intoxicated. Another officer "took" Silvernail out of the passenger side of the van, kept him "under his control," and "conducted a field interview." Silvernail was arrested a short time later, after the police learned of an outstanding warrant for his arrest in a pending misdemeanor case. Gilruth's murder had not yet been discovered when Holland, Hughes, and Silvernail were initially arrested.

After the police linked the three men to Gilruth's killing, Holland agreed to plead no contest to a charge of first-degree murder. In exchange for Holland's testimony against Hughes and Silvernail, the state agreed to dismiss assault and kidnapping charges against him. Holland testified at Silvernail's trial. He claimed that all three men had participated in beating and abducting Gilruth. Holland did not remember who actually shot Gilruth, but stated that, to the best of his memory, he did not do it himself.

Silvernail testified in his own behalf at trial, attempting to establish a defense of duress. Silvernail claimed that Holland and Hughes were responsible for taking Gilruth to the parking area outside the apartment and beating him. Silvernail testified that he attempted to intervene to prevent serious injuries but that Holland continued to beat Gilruth with a blackjack. Silvernail testified that Holland then directed him to help load Gilruth into Hughes' van, threatening that Silvernail was "next in line."

According to Silvernail, once they were in the van, he attempted to convince Hughes and Holland to take Gilruth to the hospital for medical treatment. However, Holland became enraged, shot Gilruth in the head, and continued to beat him about the head with his blackjack.

Silvernail testified that Holland forced him at gunpoint to help unload Gilruth when the van reached the outskirts of Anchorage. He claimed, moreover, that he thought Gilruth was already dead. Silvernail testified that he was afraid that if he did not follow Holland's instructions, Holland would attack him. Silvernail further testified that he accompanied Hughes and Holland back to Anchorage to change clothing and then traveled to the Safeway store with them only because Holland had directed him to do so.

At the conclusion of the trial, the jury acquitted Silvernail of first-degree murder

and first-degree assault, but convicted him of second-degree murder and kidnapping.

Silvernail initially contends that the trial court erred in denying his motion for a judgment of acquittal. Specifically, he argues that there was insufficient evidence to corroborate the testimony of Holland, an accomplice.

██ Because Holland was an accomplice, the state was required to corroborate his testimony "by other evidence which tends to connect the defendant with the commission of the crime." AS 12.45.020. Corroborative evidence is not sufficient if it "merely shows the commission of the crime or the circumstances of the commission." *Id.* To be sufficient, however, corroborating evidence need not independently establish the accused's guilt. *Brown v. State,* 693 P.2d 324, 329 (Alaska App.1984). It need only induce "a rational belief that the accomplice was speaking the truth...." *Oxenberg v. State,* 362 P.2d 893, 897 (Alaska 1961). *Accord Brown v. State,* 693 P.2d at 329.

In determining the sufficiency of the evidence, the totality of the evidence at trial must be considered. *Martin v. Fairbanks,* 456 P.2d 462, 464 (Alaska 1969). The evidence, and all of the reasonable inferences arising therefrom, must be viewed in the light most favorable to the state. *Brown v. State,* 693 P.2d at 328. The evidence, when so viewed, will be deemed sufficient if reasonable jurors could conclude that the accused's guilt has been established beyond a reasonable doubt. *Id.; Cole v. State,* 754 P.2d 752, 755 (Alaska App.1988).

██ In Silvernail's case, ample evidence was presented to corroborate Holland's testimony. Silvernail, by his own admission, was present throughout the commission of the offense, was in physical contact with Gilruth, assisted in loading him into the van, and helped to unload him

from the van. Although Silvernail attempted to establish that his conduct was motivated in part by concern for Gilruth and in part by Holland's threats, the jury was not bound by Silvernail's explanation. *See Cole v. State,* 754 P.2d at 755.

Other witnesses provided further corroborating testimony against Silvernail. There was testimony that Silvernail made threatening remarks and gestures toward Gilruth, indicating an intent to injure or kill him. The state also presented testimony identifying Silvernail as an active participant in the initial assault on Gilruth.

The independent evidence, when viewed in the light most favorable to the state, is more than sufficient to induce a rational belief that Holland's testimony was truthful. Likewise, the totality of the evidence would permit reasonable jurors to conclude that Silvernail's guilt had been established beyond a reasonable doubt. Accordingly, we find no error in the trial court's denial of Silvernail's motion for a judgment of acquittal.

Silvernail next contends that the trial court erred in allowing the state to elicit evidence that Silvernail failed to make any claim of duress to the police immediately before his arrest. At trial, the prosecution attempted to discredit Silvernail's testimony by cross-examining him about his failure to claim duress upon being stopped by the police near the Safeway store:

Q: When Officer Gaines came and took you out of the passenger seat, did you say to him, "God, I'm glad you're here."

A: No.

Q: Did you say anything about the fact that you had just been scared to death?

Silvernail's counsel asked to approach the bench. In a brief sidebar conference, which was only partially recorded,[1] Silver-

---

1. Efforts to transcribe the electronic recording of the sidebar conference were only partially successful. The transcript, in its entirety, is as follows:

    MR. CARD: I think Mr. Linton is coming perilously close to mentioning the events of [indis-

cernible] prior to, asked for an attorney and so forth, and he already did say that.

THE COURT: I'm sorry? That what?

MR. CARD: I think the man on direct said something about "they want to talk to an attorney" and something. And I don't mind going into that point, but I don't think Mr.

nail's counsel objected to the prosecution's questions "on fifth amendment grounds." The trial court ruled that, although the state was foreclosed from asking about Silvernail's post-arrest or post-*Miranda* silence, it could inquire about his failure to make any statements before being taken into custody.[2]

Thereafter, the prosecution continued its cross-examination on the issue:

Q: You never said to the police officer when he came up to the car, "Hey, I know a guy who just killed a guy. Let me tell you about it."

A: No.

Q: You never said, "Gee, I'm relieved. You're finally here to help me" right?

A: No, I didn't say that.

Linton should go into anything after that, suggesting that he had no opportunity to speak and did not. [sic]
MR. LINTON: Judge, this is wholly inconsistent with the assertion made by him all the way until now, that he was scared [indiscernible] for an hour and a half, and now he's going to say ...
THE COURT: It seems to me that under *Bloomstrand v. State*, which coincidentally is a case I tried, so I'm pretty familiar with the appeal, prearrest silence, prior to *Miranda* warnings being given, pre-arrest silence is admissible to impeach an assertion of the defendant that would be inconsistent with silence. In that case, it was, uh, the defendant later claimed it was an accidental killing and, you know, didn't—he was with the defendant and he was cross-examined by, about not calling the police [indiscernible] reasonable. In this case, it seems to me that certainly, at the time, it would—What was your question going to be?
MR. LINTON: He was going to take him to jail [indiscernible] next night [indiscernible] tell them [indiscernible].
THE COURT: [indiscernible] custody [indiscernible]? Once he's in custody, he does have a sixth amendment right; things of that nature come into play. I thought you were talking about in the car, when the police stopped him in the car, you know, that he didn't say "Help me! Help me!", you know.
(indiscernible simultaneous speech by the Court and by Mr. Card)
MR. CARD: ... was arrested
THE COURT: Yes, I would say after he's arrested, out of the car [indiscernible]. And I'll let you be heard outside the presence of the jury if you want to go further on that, but my ...
MR. LINTON: The state [indiscernible]
THE COURT: ... my inclination is that, you know, before the arrest it would be all right,

During final argument, the prosecution commented on Silvernail's silence:

So, let's look at his testimony a little bit. He says that he was, in effect, a victim himself. That he was forced to do all of these things. None of that story make sense if we look to the objective things.... But [indiscernible] running away from the Safeway store and the cops are there and the source of this threat is gone. Mr. Silvernail—I mean Mr. Hughes—Holland, is in handcuffs. He's free. All of his burdens should have been lifted from him, if in fact [indiscernible]. He should have said to Officer Gains, "Boy, I'm glad you guys got me. Let me tell you what happened. The guy [indiscernible] he just shot

before arrest or before *Miranda* warnings, but after arrest or after *Miranda* warnings are given, that any silence cannot be granted.

2. Realizing that the sidebar conference had in all likelihood not been properly recorded, the trial court later summarized its ruling for the record, out of the presence of the jury:

THE COURT: Record should reflect all the jurors are absent. You can be seated. I just want to make sure there's a good record of Mr. Card's last objection regarding—because it was a bench conference, regarding it. There's an objection as to Mr. Linton's questions regarding the actions of the defendant at the time the officer stopped the defendant. The basis for the objection, as I understand it, was fifth amendment grounds.
MR. CARD: That's correct, Your Honor.
THE COURT: My ruling was that Mr. Linton could go into matters made before—go into the defendant's silence as it demonstrated inconsistency with his story prior to the time he was in custody or advised of *Miranda* warnings. In other words, at the initial stop. My finding was that pursuant to *Bloomstrand v. State*, that those questions are reasonable and would lead to questions in any reasonable person's mind why someone that had been kidnapped or et cetera, et cetera did not immediately tell someone about that. Didn't pick up a phone and tell someone about it or didn't tell an officer upon an immediate stop. Of course, once the defendant was placed in custody or advised of the *Miranda* warnings that would be a different story and Mr. Linton was advised to stay away from that and he did stay away from that. Anybody want to add anything to the bench conference?
MR. CARD: I think that's a fairly accurate from the defense point of view, Your Honor.

somebody. He's been scaring me for the last half hour."

On appeal, Silvernail argues that the evidence concerning his failure to make a statement to the police violated his rights to due process and to remain silent, as guaranteed under article I, sections 7 and 9 of the Alaska Constitution.[3] In the alternative, Silvernail argues that the disputed evidence should have been excluded under Alaska Rule of Evidence 403,[4] because its probative value was outweighed by its potential for prejudice.

■ We turn first to Silvernail's argument that the trial court erred in failing to exclude the disputed evidence on the ground that its probative value was outweighed by its potential for prejudice. The state correctly points out that Silvernail did not specifically object to the disputed evidence on this ground below; his argument must therefore be evaluated under the plain error rule.[5] Under the plain error rule, an error that has not been called to the attention of the trial court will not be considered on appeal "unless it affects a substantial right and is obviously prejudicial." *Dorman v. State*, 622 P.2d 448, 457 (Alaska 1981) (footnote omitted).

■ In the present case, the error alleged is the trial court's decision to permit questions concerning Silvernail's silence without first determining whether the probative value of the challenged line of inquiry was outweighed by its potential for prejudicial impact. We conclude that the trial court's failure to balance probative value against prejudicial impact amounted to plain error.

■ Our decision to find plain error is influenced by several related considerations, the foremost of which is that Silvernail did in fact object to the disputed line of questions, albeit only on fifth amendment grounds. Although the evidentiary issue that Silvernail argues on appeal was not specifically raised below, his objection on constitutional grounds was nonetheless sufficient to call the trial court's attention to the fact that this line of inquiry was disputed.

A closely allied consideration is the inherent relationship between the constitutional rule that was actually invoked by Silvernail below and the evidentiary principles that he argues on appeal. The underlying rationale of the constitutional bar against admitting evidence of a defendant's post-arrest silence is the concern that such evidence is only minimally probative, while possessing a high potential for prejudice to the defendant's case. This is the same basic concern expressed in Alaska Rule of Evidence 403. *Compare Doyle v. Ohio*, 426 U.S. 610, 617–20, 96 S.Ct. 2240, 2244–46, 49 L.Ed.2d 91 and especially n. 10 (1976), *with United States v. Hale*, 422 U.S. 171, 177, 95 S.Ct. 2133, 2137, 45 L.Ed.2d 99 (1975). Thus, Silvernail's fifth amendment objection not only flagged the need for caution in admitting the disputed line of inquiry, but also invoked the underlying policies that are involved in the evidentiary claim that he now asserts on appeal.

The close relationship between the constitutional prohibition against evidence of an accused's silence and the inherent lack of

---

**3.** Article 1, section 7, of the Alaska Constitution provides, in relevant part: "No person shall be deprived of life, liberty, or property, without due process of law."

Article 1, section 9, of the Alaska Constitution provides, in relevant part: "No person shall be compelled in any criminal proceeding to be a witness against himself."

In arguing that the disputed evidence violated his rights under the Alaska Constitution, Silvernail recognizes that the United States Supreme Court has interpreted the federal constitution as precluding only evidence of post-*Miranda* silence. *See Fletcher v. Weir*, 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982).

**4.** Alaska Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**5.** Alaska Criminal Rule 47(b) provides:

(b) *Plain Error*. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

probative value of such evidence has become apparent since the United States Supreme Court has interpreted the federal constitution to preclude evidence of a defendant's silence only after the defendant has been given *Miranda* warnings. *See Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 1312, 71 L.Ed.2d 490 (1982). Despite *Fletcher v. Weir,* numerous state courts have continued to condemn evidence of pre-*Miranda* silence. While some courts have relied on state constitutional provisions, many have elected to rely instead on evidentiary grounds. *Compare People v. Jacobs,* 158 Cal.App.3d 740, 204 Cal.Rptr. 849 (1984), *Lee v. State,* 422 So.2d 928, 930 (Fla.App.1982), *Commonwealth v. Turner,* 499 Pa. 579, 454 A.2d 537, 540 (1982), *State v. Davis,* 38 Wash.App. 600, 686 P.2d 1143, 1146 (1984), *State v. Brecht,* 143 Wis.2d 297, 421 N.W.2d 96 (1988), and *Westmark v. State,* 693 P.2d 220 (1984) (all of which rule on state constitutional grounds), *with People v. Fondron,* 157 Cal. App.3d 390, 204 Cal.Rptr. 457 (1984), *People v. Quintana,* 665 P.2d 605 (Colo.1983), *Commonwealth v. Nickerson,* 386 Mass. 54, 434 N.E.2d 992, 994–97 (1982), *People v. Conyers,* 52 N.Y.2d 454, 438 N.Y.S.2d 741, 420 N.E.2d 933 (1981), and *Farley v. State,* 717 P.2d 111 (Okla.Crim.App.1986) (all of which rely on balancing probative value versus prejudicial impact).

Furthermore, the Alaska Supreme Court and this court have both expressed distrust of silence as probative evidence of guilt. *See, e.g., Doisher v. State,* 658 P.2d 119, 121–22 (Alaska App.1983); *Dorman v. State,* 622 P.2d 448 (Alaska 1981); *Nelson v. State,* 691 P.2d 1056, 1060 (Alaska 1984). *See also Elson v. State,* 659 P.2d 1195 (Alaska 1983); *Bargas v. State,* 489 P.2d 130, 133 (Alaska 1971). Both the Alaska Supreme Court and this court have previously recognized the low probative value of silence, as well as its concomitantly high potential for prejudice. Our decisions have specifically pointed out that, even when such evidence is not otherwise barred, its probative value must be balanced against its potential for prejudicial impact before a decision to admit the evidence is made. *See Doisher v. State,* 658 P.2d at 121 n. 10;

*Doisher v. State,* 632 P.2d 242, 255 (Alaska App.1981). *See also Blue v. State,* 558 P.2d 636, 645 n. 21 (Alaska 1977). Neither the Alaska Supreme Court nor the courts of other jurisdictions have shied away from finding plain error in cases in which evidence of the defendant's silence has been introduced as probative evidence of guilt. *See, e.g., Dorman v. State,* 622 P.2d at 458–59; *Gunnerud v. State,* 611 P.2d 69 (Alaska 1980); *People v. Fondron,* 157 Cal. App.3d 390, 204 Cal.Rptr. 457 (1984).

Notably, the trial court's decision in the present case to allow inquiry into Silvernail's silence does not appear to have been influenced by the absence of a specific claim that the evidence was inadmissible under Alaska Rule of Evidence 403. Instead, the court apparently admitted the disputed evidence because it believed that evidence of an accused's pre-arrest silence was automatically admissible under this court's decision in *Bloomstrand v. State,* 656 P.2d 584 (Alaska App.1982). *Bloomstrand,* however, did not purport to authorize the admission of pre-arrest silence. While *Bloomstrand* recognized that evidence of pre-arrest silence is not precluded as a matter of federal constitutional law, the case expressly left open the issue of admissibility of such evidence under Alaska law:

> The propriety of comment on pre-arrest silence under the Alaska Constitution has not specifically been addressed.... However, we find that under the particular facts of this case, it is unnecessary for us to determine whether and to what extent the Alaska Constitution protects a defendant from comment by the prosecution on his invocation of the right to remain silent.

*Bloomstrand,* 656 P.2d at 587.

Finally, in the present case, it seems inconceivable that the limited scope of the objection below could have resulted from a tactical or strategic decision by Silvernail's trial counsel. As noted by the Alaska Supreme Court under similar circumstances:

> In the instant case, defendant ... neither injected the issue of his silence into the case nor obtained a benefit from the

prosecutor's inculpatory comment. There is no basis for the inference that defense counsel was trying to further [the defendant's] case by failing to object ..., unless it is implied that defense counsel invited error for the purpose of obtaining a reversal on appeal. That conclusion, however, is not one which should be lightly inferred in any case, for it would preclude review of the most fundamental defects under the plain error doctrine; further, it is not supported by the record in this case....

*Dorman v. State,* 622 P.2d at 458.

In short, the plain error rule is designed "to mitigate ... the harsh effects of a rigid application of the adversary method of trial...." *Bargas v. State,* 489 P.2d at 133. We find this to be an appropriate case for application of the rule and conclude that the trial court committed plain error in failing to balance the probative value of the disputed inquiry against its potential for prejudice prior to determining its admissibility.

██ A balancing of the probative value of the disputed evidence against its prejudicial impact yields the conclusion that it should not have been admitted. We recognize that, since the United States Supreme Court's decision in *Fletcher v. Weir,* some cases have allowed evidence of an accused's silence to be admitted under analogous circumstances. *See, e.g., United States v. Shue,* 766 F.2d 1122 (7th Cir. 1985).[6] Yet such cases are at odds with the apparent weight of authority and reflect what we believe to be an unrealistic view of the significance of an accused's failure to speak to the police.

In *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99

(1975), the United States Supreme Court stated that "[i]n most circumstances silence is so ambiguous that it is of little probative force." The Court went on to note that silence is probative only under circumstances in which it would have been natural for the accused to speak:

[S]ilence is commonly thought to lack probative value on the question of whether a person has expressed tacit agreement or disagreement with contemporaneous statements of others. Silence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation. Failure to contest an assertion, however, is considered evidence of acquiescence only if it would have been natural under the circumstances to object to the assertion in question.

*Id.* (citations omitted). A similar approach has been taken by the Alaska Supreme Court in analogous circumstances to determine the relevance of an accused's silence. *See Doisher v. State,* 658 P.2d at 121.

In the present case, the disputed line of inquiry was allowed for purposes of impeaching Silvernail's claim of duress at trial. The inquiry established that, when confronted by the police shortly after Gilruth's murder, Silvernail did not reveal his coerced participation in the offense. Yet, given the events surrounding Silvernail's contact with the police, it would hardly have been "natural under the circumstances" for Silvernail to have made a full disclosure of his situation.

At best, Silvernail's silence was highly ambiguous. As the United States Supreme Court has observed:

---

**6.** The state also cites *United States v. Brooks,* 786 F.2d 638 (5th Cir.1986), as an analogous case. *Brooks,* however, is clearly distinguishable. In *Brooks,* the defendant claimed at trial that when he received a paper bag containing money—which the government subsequently alleged to be a bribe—he believed that the money had been given to him as repayment for a loan. In response, the government was allowed to bring out the fact that Brooks had not made this claim to FBI agents who seized the bag shortly after it had been given to Brooks. Brooks, however,

did not remain silent when confronted by the FBI agents. Rather, he told them he did not know what was in the bag—a claim later contradicted by his trial testimony. *Brooks* is thus a case in which an accused's pretrial statement was inconsistent with his testimony at trial. In this limited context, the accused's failure to assert a defense prior to trial has frequently been ruled admissible. *See, e.g., Sidney v. State,* 571 P.2d 261, 263–64 (Alaska 1977); *Nelson v. State,* 691 P.2d 1056, 1060 (Alaska App.1984).

At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention.

*United States v. Hale,* 422 U.S. at 177, 95 S.Ct. at 2137 (citations omitted).

This distrust of the probative value of silence was echoed by the New York Court of Appeals in *People v. Conyers,* 52 N.Y.2d 454, 438 N.Y.S.2d 741, 743, 420 N.E.2d 933, 935 (1981) (citations omitted):

[E]vidence of an individual's pretrial failure to speak ... is of extremely limited probative worth.... [T]he individual's silence in such circumstances may simply be attributable to his awareness that he is under no obligation to speak or to the natural caution that arises from his knowledge that anything he says might later be used against him at trial. Alternatively, the individual may refrain from speaking because he believes that efforts to exonerate himself under the circumstances would be futile. Finally, it is a lamentable but undeniable fact of modern society that some of our citizens harbor a mistrust for law enforcement authority which leads them to shun contact with the police even when the avoidance of contact is not in their own best interest.

*See also People v. Fondron,* 157 Cal. App.3d 390, 204 Cal.Rptr. 457, 463 (1984).

In *Farley v. State,* 717 P.2d 111, 112 (Okla.Crim.App.1986), the court expressed similar concerns:

One can conceive of a variety of situations where an innocent suspect would not offer himself or his story to the police. For example, the suspect may believe that he has committed no crime and therefore has no call to explain himself to the police. Or, he may fear disbelief of his story or retaliation by the police. He may feel that since the circumstances point to his guilt, he needs to remain free to try to prove his innocence.

In *People v. Quintana,* 665 P.2d 605 (Colo.1983), which is factually similar to the present case, the Colorado Supreme Court found evidence of the accused's silence irrelevant to impeach a claim of duress. The court concluded: "In short, the existence of duress was not rendered less probable with the evidence of the defendant's postarrest silence than without it." *Id.* at 611.

The state attaches great significance to the fact that the disputed line of inquiry in the present case pertained to Silvernail's silence before he was formally placed under arrest. The state seeks to distinguish cases such as *People v. Quintana* and *People v. Conyers* on the ground that they deal with post-arrest silence.

We find little significance in this distinction under the circumstances of Silvernail's case. Admittedly, distinctions between pre-arrest, post-arrest, and post-*Miranda* silence can be of vital importance in determining whether a prosecutor's reference to silence violates federal constitutional protections. *See, e.g., Fletcher v. Weir,* 455 U.S. at 607, 102 S.Ct. at 1312; *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).

These distinctions are decidedly less significant when the issue is whether the accused's silence is probative of guilt. Resolution of this issue turns upon a case-by-case examination of the evidence, and not upon the formalistic nomenclature that attaches to the accused's custodial status.

For this reason, cases that have analyzed the admissibility of an accused's silence by weighing probative value against prejudicial impact have not restricted themselves to post-arrest situations. *See, e.g., Farley v. State,* 717 P.2d at 112; *Commonwealth v. Nickerson,* 434 N.E.2d 992, 994 (Mass. 1982); *State v. Fencl,* 109 Wis.2d 224, 325 N.W.2d 703 (1982), *modified, State v. Brecht,* 143 Wis.2d 297, 421 N.W.2d 96

(1988). *See also People v. Conyers,* 420 N.E.2d at 935 (speaking in terms of a defendant's "pretrial silence" rather than in terms of a defendant's "post-arrest silence"). *See also Doisher v. State,* 658 P.2d 119 (Alaska 1983) (finding inadmissible a defendant's silence in the face of an accusation by his wife).

In the present case, the inquiry concerning Silvernail's silence pertained to a situation in which Silvernail was engaged by the police in a plainly confrontational setting: Silvernail and Hughes had just been stopped after attempting to elude the police in Hughes' van. Hughes was immediately placed under arrest, and Silvernail was in the "control" of another officer. Silvernail had no reason to believe that the officers who had stopped him were aware of Gilruth's murder, yet he was aware of his own intimate connection with the offense. At the time of the stop, Silvernail was still wearing a T-shirt soaked with Gilruth's blood.

Whether Silvernail was entitled to *Miranda* warnings under the circumstances is debatable. The stop appears to have exceeded what can safely be characterized as a "routine" traffic stop. *See Berkemer v. McCarty,* 468 U.S. 420, 435–42, 104 S.Ct. 3138, 3147–52, 82 L.Ed.2d 317 (1984) (holding *Miranda* warnings unnecessary following routine traffic stops). The issue, however, is beside the point. At the very least, Silvernail was the subject of a stop amounting to a seizure of his person. *See Berkemer v. McCarty,* 468 U.S. at 436–37, 104 S.Ct. at 3148–49; *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979); *Waring v. State,* 670 P.2d 357 (Alaska 1983). Whether or not *Miranda* warnings were required, Silvernail was clearly "not obligated to respond to the officers who stopped him." *Berkemer,* 468 U.S. at 439, 104 S.Ct. at 3150. His silence may well have reflected nothing more than his awareness of and reliance on this right.

Silvernail's silence might have been considerably less ambiguous if it appeared from his testimony that the police had rescued him from imminent peril. But this was not the case. According to Silvernail, Richard Holland was the only person who had threatened him and whom he feared. Hughes had done nothing threatening or coercive toward Silvernail, and Silvernail had no reason to fear him. Thus, at the time Hughes and Silvernail were stopped, Silvernail no longer had any immediate cause to be fearful. He was aware that Holland had already been taken into custody and no longer posed a threat.

For Silvernail to have disclosed Holland's recent threats and coercive behavior, Silvernail would have had to reveal his own intimate connection to the crime. Given the extent of his own participation in the events surrounding Gilruth's death, Silvernail's story would obviously have been highly incriminating unless the police were willing to accept at face value his claim of duress. Given the circumstances surrounding Silvernail's encounter with the police, however, Silvernail would have had to be among the most trusting and naive of souls to believe that the police would be willing to accept at face value anything that he told them at that point.

Assuming Silvernail's claim of duress to have been true, it would hardly seem "natural under the circumstances," *United States v. Hale,* 422 U.S. at 176, 99 S.Ct. at 2136, for him to have disclosed his claim to the police. To the contrary, the far more "natural" decision may well have been to maintain a prudent silence for the time being.

Because Silvernail's silence appears to have been at least as consistent with innocence as it was with guilt, to allow the prosecution to inquire into his silence could do nothing to advance the legitimate cause of determining the truthfulness of Silvernail's claim of duress. On the other hand, the potential prejudice from this line of inquiry is both obvious and substantial. Inquiry into Silvernail's silence was thus plainly improper under Alaska Rule of Evidence 403.

The issue of Silvernail's guilt rested heavily on the jury's evaluation of the relative credibility of the conflicting testimony given by Holland, on the one hand, and

Silvernail, on the other. We are therefore unable to conclude that the erroneous admission of the disputed evidence did not appreciably affect the jury's verdict. *Love v. State,* 457 P.2d 622, 634 (Alaska 1969).

Accordingly, we conclude that the conviction must be REVERSED.[7]

---

**7.** Our disposition makes it unnecessary to consider the other issues raised by Silvernail in this appeal or to resolve the issues raised in his separate appeal from the superior court's denial of his motion for a new trial.