UNITED STATES of America,
Plaintiff-Appellee,

v.

Frank Rudolph ESPOSITO and Richard
Piekarski, Defendants-Appellants.

Nos. 83–3233, 84–1126 and 84–1612.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1985.

Decided Aug. 22, 1985.

Rehearing Denied Sept. 18, 1985.

Gerald M. Werksman, Chicago, Ill., Frank Oliver, Northfield, Ill., for defendants-appellants.

James B. Meyer, Asst. U.S. Atty., R. Lawrence Steele, Jr., U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Defendant Piekarski was convicted of five violations of the Hobbs Act (18 U.S.C. § 1951) and one violation of the Travel Act (18 U.S.C. § 1952). Defendant Esposito was convicted of seven violations of the Hobbs Act and four violations of the Travel Act. Each was sentenced to twenty years imprisonment on each of the Hobbs Act counts, with the sentences to run concurrently, and to five years on the Travel Act counts, to run concurrently with each other, but consecutively to the twenty-year terms. They appeal.

There was ample evidence that defendants attempted extortion of money from Timothy Janowsky who did business in Indiana and that Janowsky made purchases in interstate commerce. There was ample evidence that each defendant travelled from Illinois to Indiana with the intent to extort. Their arguments on appeal rest on other facts of the indictment and trial which will be described in the course of discussion of the respective points.

## I. VARIANCE

Each Hobbs Act count alleged that Janowsky did business as Geno's Vending in Merrillville, Indiana, a business engaged primarily in supply and servicing, via delivery vehicles, coin-operated vending machines and electronic amusement machines in the Northwest Indiana area; that the vehicles, machines, and associated equipment and supplies would move into Indiana for sale to and use by Geno's Vending; that defendants attempted to affect the movement of these machines and vehicles by extortion; that they attempted to obtain from Janowsky, doing business as Geno's Vending, 50% of the profit realized by Janowsky, doing business as Geno's Vending, derived from electronic game and amusement machines leased from or operated by Geno's Vending.

■ The claim of variance arises in part from the evidence that the extortionate demands were for 50% of the profits from electronic poker machines used for gambling, whereas the indictment charges a demand for 50% of the profit derived from electronic game and amusement machines. Janowsky also supplied other types of coin-operated machines, and derived proceeds which were not included in the extortionate demands.

There was testimony that electronic poker machines are amusement machines. Giving the words their ordinary meanings, an electronic poker machine appears to be a type of electronic game or amusement machine even though the poker machine has features which make it more useful than others as a gambling device. Defendants argue that the poker machine is not an amusement device because under an Indiana statute, Ind.Code Ann. 35–45–5–1 (Burns 1985), an electronic poker machine would be classified as a gambling device and distinguished from "pinball machines and similar amusement devices." The Government tells us that whether an electronic poker machine is a *per se* gambling device under the cited statute is an unsettled controversy in Indiana. In any event, the Indiana statute does not control the definitions for the purpose of the meaning of the indictment in the instant case.

■ The remaining claim of variance arises from the evidence that Janowsky not only owned and operated an establishment known as Geno's Vending in Merrillville, as alleged in the indictment, but also Blackbeard's Arcade in Crown Point. The poker machines and other goods were purchased in interstate commerce in the name of Geno's Vending. The Government asserts that:

The evidence at trial showed that the electronic poker machines were purchased by Geno's Vending, shipped to Geno's Vending, paid for by Geno's Vending, and the profits derived therefrom were considered profits of Geno's Vending. The proof at trial was that the receipts from all gaming machines (video

games and electronic poker machines) were combined and considered profits of Geno's Vending.

Appellee's Br. at 21–22. Defendants point to evidence that proceeds from the electronic poker machines, used as gambling devices, were not handled and recorded in the ordinary course at the Geno's Vending establishment. They were taken to Janowsky's home, and counted and recorded by him and his wife. Some, perhaps, were included as receipts of Blackbeard's. Defendants appear to consider Geno's Vending as an entity, Blackbeard's Arcade as a different entity, and each as separate from Janowsky, the individual who owned and operated them. They argue that the indictment alleged Geno's Vending was the "victim" of the attempted extortion, but the proof showed a different "victim," Janowsky, who did not purchase goods in interstate commerce. This distinction between Janowsky and the business he conducted is insignificant for present purposes. If the extortion had been successful, Janowsky would have given up substantial sums of money, and his capacity to purchase goods in interstate commerce would have been curtailed, whether or not the flow of money had nominally gone through his Geno's Vending establishment, and whether or not the goods purchased in interstate commerce would continue to be purchased in the name of Geno's Vending. Any variance did not affect an essential element of the offense nor impair the substantial rights of either defendant. *United States v. Cina*, 699 F.2d 853, 856–58 (7th Cir. 1983). Defendants had adequate notice of the charges and their protection against second prosecution for the same offense was not impaired.

## II. SPOLIATION

In furtherance of defendants' theory that the funds to be extorted did not belong to Geno's Vending they subpoenaed Janowsky to produce the records of Geno's Vending. He was unable to produce the poker machine records, and testified that he had burned them after he was first approached by defendants. Defendants had demanded

a list of the locations of the electronic poker machines. After receiving the subpoena he had defaced some of his checks and bank records, allegedly because he did not want defendants to get a list of his accounts and account numbers.

Defendants' motion to dismiss based on this destruction of evidence was denied. They also requested an instruction that:

> When a *witness* is shown *intentionally* to have destroyed, altered or defaced evidence, which, were it produced in its original undamaged form would be expected to support his testimony, his destruction or alteration thereof gives rise to a *presumption* that the evidence, were it available in its undespoiled form, would contradict and rebut the testimony of the witness who despoiled it.

(Emphasis added.)

The district judge refused the instruction, ruling that the destroyed records were irrelevant, apparently upon reasoning, similar to ours in finding no variance, that it made no significant difference whether the poker machine proceeds were accounted for in the ordinary course of bookkeeping of Geno's Vending, or separately received and recorded by Janowsky.

In any event, Janowsky's destruction of evidence did not entitle defendants to dismissal nor to the instruction requested.

■ In brief, the spoliation doctrine relied on applies to a party, not a witness who is not a party, and there is no suggestion here that the Government or its agents participated in Janowsky's destruction nor condoned it. In addition to an intentional destruction, bad faith must be shown. And if the doctrine applied, it would give rise to an inference, not a presumption.

As Wigmore states the spoliation doctrine,

> [A] party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and

from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.

2 J. WIGMORE, EVIDENCE § 278 (Chadbourn rev. 1979) p. 133 (emphasis omitted). This court has noted that the spoliation doctrine applies if two conditions are met. *S.C. Johnson & Son v. Louisville & Nashville R. Co.*, 695 F.2d 253, 258 (7th Cir.1982). A party must destroy evidence, and its destruction must have been in bad faith. *Id.* See *Coates v. EEOC*, 756 F.2d 524, 550–51 (7th Cir.1985).

## III. EFFECT OF MIXED LEGAL–ILLEGAL BUSINESS

■ Appellants contend that the district court erred in denying their motion to dismiss which alleged that Janowsky's business was not protected under the Hobbs Act, 18 U.S.C. § 1951, because the evidence established that he was involved in some illegal activities. This circuit has held that the Hobbs Act was not limited to wholly legitimate operations, but extends to "mixed legal-illegal business ventures." *United States v. Blakey*, 607 F.2d 779, 783 (7th Cir.1979).

*Blakey* controls this case. Indeed, even if Janowsky's business had been totally illegal the Hobbs Act would apply. *United States v. Ambrose*, 740 F.2d 505, 511–12 (7th Cir.1984); *United States v. Hanigan*, 681 F.2d 1127, 1131 (9th Cir.1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983).

## IV. POLTE–BURKE QUESTIONS

### A. Pre-Trial Motions

■ Defendants employed Dennis Burke, a private investigator, to assist them in preparing their defense. Burke assigned the case to Lawrence Polte, an employee. Six weeks before trial, Polte (who may no longer have been an employee) was arrested and charged under the Hobbs Act, apparently for an attempt to extort money from Janowsky. The charge was later dismissed.

The affidavit supporting the complaint was signed by an FBI agent. It stated that on August 24, 1983 Janowsky reported to affiant that a John Smith had said he had evidence harmful to Janowsky, but could insure its disappearance for $6,000; that affiant recorded subsequent calls in which Smith repeated his assertions; that FBI agents arrested the person whom they had observed placing one of the calls. Smith turned out to be Polte.

Defendants made a motion for an evidentiary hearing concerning Sixth Amendment violations. They asserted they had had conferences with Burke concerning plans for defense. They also sought an order requiring the Government to make available the recordings of the conversations, investigative reports concerning the incident, and any relevant information turned over by Polte.

The district court examined (*in camera*) tapes and other items produced by the Government, determined they were not material to the present case, and denied the motions. The procedure used was adequate to safeguard defendants' interests. *United States v. Wilson*, 715 F.2d 1164, 1169–70 (7th Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983). We have listened to the tapes produced and examined the other *in camera* materials, and conclude the district court action was correct.[1]

As the record stood when the motions were denied, there was no suggestion that the Government was responsible for any intrusion into defense councils. The only information about defense strategy which came to the Government in the course of the Polte affair was that defendants were having Janowsky investigated. None of the information in the *in camera* materials was conceivably favorable or unfavorable to defendants nor likely to be even marginally useful in impeaching Janowsky as to any testimony he might give relevant to the indictment.

## B. Section 2255 Motion

 After appeals were taken from final judgment, defendants filed a motion seeking a hearing to determine whether they are entitled to relief under 28 U.S.C. § 2255.

On January 30, 1984, two *Chicago Sun-Times* columnists had included the following paragraph:

PUSHERS' FUZZ-BUSTER: Dennis Burke, a former Chicago vice cop who's now a private detective, is working with narcotics agents to check out what they believe is a new racket—an early warning system for cocaine pushers. Burke fingers Richard Randazzo, an ex-convict with crime syndicate connections, as the perpetrator. He says informants have related that Randazzo uses radio scanning equipment to monitor law enforcement agencies. Then, says Burke, Randazzo warns certain dope pushers that they're subjects of surveillance—for a fee. One of the top investigators, a member of the joint federal and local narcotics task force, says he has heard the same report of Randazzo's activities from an informant. Burke says Randazzo recently has eased off with his capers, apparently fearing he could be busted for obstruction of justice.

Petacque, A. and Hough, H., *Waltzing Away From Condo Deal*, Chi. Sun-Times, Jan. 30, 1984 at 11, col. 2.

Defense counsel filed his affidavit concerning a conversation with Randazzo in which Randazzo said he had asked Burke whether he was working for federal or local law enforcement agencies. "Randazzo told me that Burke never gave him a satisfactory answer and that Randazzo now believes—based on what occurred— that Burke is in the employment of local and federal law enforcement agencies."

The Government filed an answer and a supporting affidavit of the Assistant Unit-

---

**1.** One 302 report indicates that one other telephone conversation was recorded, although no tape for that conversation was among those produced. Under the circumstances we are satisfied this was an inadvertence and insignificant.

ed States Attorney assigned to the present case. Affiant stated that he had no contact with Burke except on one occasion in the presence of defense counsel when Burke stated that Polte was not in Burke's employment at the time of his arrest; that affiant had, after Polte's arrest, advised the agents investigating Polte not to question Burke concerning matters arising out of Burke's employment by defendants, and the agents assured affiant they had not done so.

The district court denied the motion, saying:

> A motion under § 2255 is ordinarily improper during the pendency of a direct appeal from a conviction, and this case presents no extraordinary circumstances compelling District Court review. *See United States v. Gordon,* 634 F.2d 639 (1st Cir.1980); *United States v. Davis,* 604 F.2d 474 (7th Cir.1979).

We again conclude that the district court was correct. The vague newspaper report of a relationship between Burke and "narcotics agents" and the belief of Mr. Randazzo provide no basis for supposing that Burke would or did betray to the Government the defense strategy of his paying clients in this case, and the prosecutor's affidavit is a positive statement that he had no contact with Burke other than one known to the defense and that any information obtained by the Government was limited to that which came from Polte and as a result of Polte's arrest. The *in camera* materials remain as clearly immaterial as they were before.

## V. DEFICIENCY IN TRAVEL ACT COUNTS

The Travel Act, 18 U.S.C. § 1952, provides as follows:

> (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
>
> (1) distribute the proceeds of any unlawful activity; or
>
> (2) commit any crime of violence to further any unlawful activity; or
>
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

As applied to this case, the essential elements of the offense are: (1) travel in interstate commerce (Illinois to Indiana), (2) intent to carry on the unlawful activity of extortion, and (3) an attempt after the interstate travel to extort money. Each of the Travel Act counts (IV, VI, VIII and X) charged elements (1) and (2), but did not charge (3). The drafter of the indictment left element (3) out of these counts, inadvertently of course, because element (3) conduct was included in other counts.

Defendants did not move to dismiss the Travel Act counts, but we acknowledge that the failure of an indictment to charge an offense is subject to review and dismissal at any stage, including appeal. *United States v. Clark,* 412 F.2d 885, 888 (5th Cir.1969); *Chappell v. United States,* 270 F.2d 274, 276 (9th Cir.1959).

It is clear that when the indictment is read as a whole it gave defendants notice that they were charged with attempts to extort, necessarily included within attempts to affect commerce by extortion, on dates later than, as well as the same as, the dates of interstate travel.

Piekarski was charged in Count IV with interstate travel on or about April 8, 1983. Count III charged him with an attempt to affect commerce by extortion on or about April 8, 1983, and the evidence makes clear that the attempt at extortion took place after the travel. He was also charged with an attempt to affect commerce by extortion on or about April 19, 1983 (Count XI) and on or about April 28, 1983 (Count XII).

The same analysis can be made as to Esposito. He was charged with interstate travel on or about April 8 (Count IV), April

11 (Count VI), April 14 (Count VIII) and April 18 (Count X). He was charged with attempts to affect commerce by extortion on or about April 8 (Count III), April 11 (Count V), April 14 (Count VII), April 18 (Count IX) and April 19 (Count XI).

The court's instructions correctly informed the jury as to each Travel Act count that the Government had the burden of proving each of elements (1), (2) and (3) beyond a reasonable doubt.

■ There is no question but that Counts IV, VI, VIII and X, standing alone, were defective in failing to charge an essential element of the offense. In the context of this indictment, however, vacating the convictions and ordering these counts dismissed would be an extreme example of technicality, unnecessary to protect the rights of the defendants. The missing elements of attempts to extort occurring after the interstate travel were included in other counts in the same indictment and must necessarily have been found beyond a reasonable doubt on the other counts.

Defendants rely on *United States v. Wander*, 601 F.2d 1251 (3rd Cir.1979). There also was a failure to charge element (3) in Travel Act counts. The court held:

> As is readily apparent, no mention is made of a subsequent act in furtherance of the unlawful activity. Nor is any portion of Count I incorporated by reference. The failure to aver a subsequent overt act in furtherance of the unlawful activity renders Counts II through IV of the indictment defective and compels us to dismiss them.

601 F.2d at 1259 (citations omitted).

It appears that Count I in *Wander* charged conspiracy. It is not clear whether allegations in Count I would as clearly as in this case have supplied the deficiency if read with the Travel Act counts, nor whether the conviction on Count I (which was reversed for trial error) necessarily established that element (3) acts had occurred after the instances of interstate travel. In the instant case, as already indicated, the elements missing from the Travel Act counts were charged in other counts,

and must have been found by the jury. We think the differences in the indictments are sufficient to distinguish *Wander*.

Reindictment and retrial on the Travel Act counts here, necessarily including proving again the attempts to extort which followed the instances of interstate travel, would be a pure waste of energy because defendants would not thereby be afforded any protection of their rights which was not afforded in the first trial.

The judgments appealed from are AFFIRMED.