**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert F. HAGMANN, Defendant–
Appellant.**

**No. 91–4031.**

United States Court of Appeals,
Fifth Circuit.

Dec. 18, 1991.

Rehearing Denied Jan. 29, 1992.

Peter Goldberger, Philadelphia, Pa., (Court-appointed), for defendant-appellant.

Josette L. Cassiere, Asst. U.S. Atty., William J. Flanagan, First Asst. U.S. Atty., Joseph S. Cage, Jr., U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before DUHÉ, EMILIO M. GARZA, and WILLIAMS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant Robert F. Hagmann was arrested on February 6, 1988, while sitting in a parked van in the immediate vicinity of the site where nearly seven tons of marijuana were being offloaded from *The Lady Margaret II,* a shrimp boat that had just returned to the United States from Colombia. His arrest, along with the arrests of a number of other individuals, was the result of an investigation conducted jointly by federal and state officials. After charges against thirteen of his co-defendants were disposed of by way of plea agreements, Hagmann went to trial and was convicted for conspiracy to import and possess controlled substances with the intent to distribute. He now challenges that conviction and his sentence on the grounds that: (i) there was ex parte communication between the judge and jury; (ii) the district court improperly instructed the jury; (iii) the indictment against him is fatally defective; and (iv) the fine imposed upon him is improper. We have considered these contentions and, finding no reversible error, we affirm Hagmann's conviction.

## I.

196 bales of marijuana weighing 13,600 pounds were confiscated on February 6, 1988 by a task force of ninety-two law enforcement officials from federal, state, and local agencies. The officials moved into Lake Charles, Louisiana and arrested a group of individuals unloading this Colombian cargo. One of those arrested was defendant Hagmann.

## The Conspiracy and Investigation

Defendant Hagmann's arrest was the result of a lengthy narcotics investigation. This investigation began in November 1987 when Fred Miller, a Louisiana commercial fisherman, contacted the Louisiana State Police. Miller reported that he had been approached by James Peddie, a longtime acquaintance, who wanted to know if Miller was interested in participating in a marijuana smuggling operation. After consulting with state police, Miller told Peddie to include him and, from that point forward, Miller served as a confidential informant for the Louisiana State Police and the United States Customs Service.

On November 19, 1987, Miller and Peddie met with co-conspirators Steve Atkins and Clifford Sewell. They discussed their plan, which called for Miller to sail his boat, *The Lady Margaret II*, to Santa Maria, Colombia, pick up the shipment of marijuana, and then transport that shipment to a designated offload site in Louisiana. Miller left the meeting with maps, charts, a ham radio to install on his boat, and a listing of radio frequencies, to which was stapled one-half of a torn dollar bill—the other half of which would be in the possession of his contact in Colombia. This meeting was followed by several others with Peddie and Sewell in November and December, including one during which they searched for an adequate storage site for the marijuana. Miller received a $4,000 partial advance payment from Atkins on December 25 and then, on January 3, 1988, Miller met with co-conspirators Placente and McKibbin and was given an additional advance payment of $40,000.

Miller set out for Colombia on January 5, but had to return due to a failed radio transformer. Following another false start due to a failed navigation system, Miller arrived in Colombia on January 27. The marijuana was loaded, and *The Lady Margaret II* headed back for the United States.

*The Lady Margaret II* reached the coast of Louisiana on February 4. Placente,

through radio contact,[1] advised Miller that everything was in order to offload the following evening. Following a one-day delay due to Placente's inability to locate the offloading crew, the offloading proceeded as planned on the night of February 6. Soon after the crew began their evening chore, a prearranged signal beckoned a swarm of law enforcement agents who arrested those involved and seized *The Lady Margaret II*'s Colombian cargo.

## Co-defendants Talk Conspiracy: The Details

Pursuant to a plea agreement with the government, co-conspirator McKibbin pled guilty to conspiracy to import marijuana into the United States and agreed to testify at the trial of his co-defendants. McKibbin testified that he first met Hagmann in early 1987 and that, some time later, Hagmann asked McKibbin—who had previously been convicted for drug offenses—if he was interested in becoming involved in the conspiracy. Hagmann told McKibbin that he had a "connection" in South America, and he invited McKibbin to "hook up with him."

McKibbin identified the cast of conspirators and their roles. According to McKibbin, Hagmann was responsible for making arrangements to get the marijuana out of South America, store it, sell it, and then transport it from Louisiana to Florida. Lomax Smith, a distant relation of McKibbin, advanced money for the operation and arranged for the boat and offloading crew. Defendant Placente was responsible for travelling to South America to inspect the marijuana to ensure its quality, as well as supervising the loading process in Colombia and final transportation to Florida. McKibbin testified that his job was to act as an intermediary, carrying messages back and forth between Hagmann and Smith, because Hagmann had stated that he did not want to meet Smith. McKibbin understood that he would be paid $1 million for his services.

---

1. Per prearranged signal, Miller maintained daily radio contact with defendant Placente throughout the voyage.

McKibbin also testified that Hagmann and Placente told him that they had paid off the Colombian police and coast guard to ensure that the marijuana could be picked up unimpeded. Hagmann also told McKibbin that a surveillance team would be monitoring the radio frequencies of the Customs Service and the Drug Enforcement Administration. In fact, on the day the marijuana was to be offloaded, a United States Customs Agent arrested Bryan Morris in a Winnebago full of electronic surveillance and scanning equipment. Morris, after pleading guilty to interstate travel to conduct an unlawful activity, testified that he was recruited by defendant Hagmann to conduct countersurveillance activity in connection with the delivery of the marijuana shipment. Morris was to be paid $25,000 for these services.

### Hagmann's Conviction

Hagmann was arrested on February 6—the night of the offloading of the marijuana—while sitting in a parked van, with the lights out, on the side of a road in the immediate vicinity of the offloading site.[2] On February 11, 1988, a federal grand jury indicted Hagmann and fourteen others with:

(i) Conspiracy to import controlled substances into the United States, 21 U.S.C. § 963 (Count I);

(ii) Conspiracy to possess controlled substances with intent to distribute, 21 U.S.C. § 846 (Count II);

(iii) Importation of controlled substances into the United States, 21 U.S.C. § 952(a) (Count III);

(iv) Possession of controlled substances with intent to distribute, 21 U.S.C. § 841(a)(1) (Count IV); and

(v) Interstate travel in connection with unlawful activity, 18 U.S.C. § 1952(a)(3) (Count V).

Thirteen co-defendants pled guilty, and only Hagmann and co-defendant Placente were tried.

At Hagmann's trial, McKibbin, Atkins, and Morris all testified against him. Hagmann testified in his own defense, asserting that he did not meet McKibbin until August 1987, and that this meeting was related to the construction business. According to Hagmann, in October 1987, McKibbin asked him about two-way radios he needed for his business and Hagmann referred him to Placente—a referral that resulted in Hagmann being dragged into the conspiracy against his will. Hagmann testified that McKibbin later became suspicious of Placente, admitted to arranging the drug shipment with Placente, and threatened to kill Hagmann and his family if he found out that Hagmann was involved in a theft of the marijuana. According to Hagmann, the only reason he went to Louisiana was that McKibbin demanded that he do so to "make sure there were no mistakes."

The jury convicted Hagmann on all counts.[3] Hagmann was sentenced but, due to an error by the district court, this court remanded the case for resentencing.[4] Hagmann was resentenced to an aggregate term of 144 months imprisonment, 5 years supervised release, and a fine of $280,-823.80.

### II.

Appealing his conviction and resentencing, Hagmann has raised four contentions for this court to consider: (a) the district court erred when, off the record and outside the presence of the parties, it responded to a question from the deliberating jury; (b) the district court erred by instructing the jury that, in making determinations as to whether the defendant was guilty of

2. Co-defendant Placente, who was tried with Hagmann, was arrested the same evening while aboard *The Lady Margaret II* as the offloading operation was in progress.

3. The jury also convicted Placente.

4. Following Hagmann's timely notice of appeal, the government's opening brief confessed error as to the district court's imposition of a twenty-year mandatory minimum sentence. The parties jointly moved this court to vacate Hagmann's sentence and remand for resentencing, which this court did. Following Hagmann's resentencing, he again filed a timely notice of appeal.

conspiracy, it could consider the statements of "other proven" co-conspirators; (c) Count V of the indictment, charging a Travel Act violation under 18 U.S.C. § 1952, is fatally defective for failing to allege two of the elements of the offense; and, (d) in assessing Hagmann's fine, the district court erred by failing to consider statutorily-required factors—namely Hagmann's ability to pay—and imposing an excessive fine.

## A. The Judge's Response to a Question from the Deliberating Jury

While deliberating, the district court received a note from the jury stating "We the jury would like all the evidence provided in the case." The court responded by instructing its deputy clerk to send in all the physical exhibits (substituting photographs where this had been done at trial), except for the tape recordings. All of this was done off the record, outside the presence of the defendant, and without consulting the parties.

Hagmann asserts that the judge's actions violate Rule 43 of the Federal Rules of Criminal Procedure, which provides that "[t]he defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule." The government's response to this contention is that "[e]ven if such conduct violated Fed.R.Crim.P. 43, the error is harmless." [5]

We have the luxury of consensus that Rule 43 was at least technically violated. Our inquiry is therefore narrowed to determining whether that violation constitutes prejudicial error. *See United States v. Brooks,* 786 F.2d 638, 643 (5th Cir.), *cert. denied,* 479 U.S. 855, 107 S.Ct. 193, 93

L.Ed.2d 126 (1986) (where deliberating jury sent judge note requesting transcripts of testimony and judge responded that transcripts were not available, holding that, although judge should have conferred with counsel before answering the request, that error was harmless); *United States v. Breedlove,* 576 F.2d 57, 59–60 (5th Cir.1978) (holding that if judge's answer to jury's inquiry is distinctly responsive to the question and clearly states the law, and if no prejudice is shown, the violation of Rule 43 is harmless). Hagmann maintains that the Rule 43 violation was in fact prejudicial—more specifically, he asserts that (i) prejudice should be assumed because there is no record of what was said to the jury and by whom, (ii) and that, had Hagmann and his counsel been summoned, they might have persuaded the court to send in some or all of the tapes upon which the defense relied.

We disagree. A record of the judge-jury communication in question does exist: Hagmann's initial appeal to our court was suspended so that the district judge could supplement the record. Supplementing the record, the district judge stated that, after receiving the note, he instructed the deputy clerk to give the evidence to the jury. The judge merely responded to the jury's request by turning over the evidence they requested. The judge never personally communicated with the jury—a fact affirmed by an affidavit submitted by the district court's deputy clerk. This distinguishes Hagmann's case from those he cites as favorable authority on this point.[6]

Hagmann also argues that he was denied an opportunity to persuade the judge to turn over some of the tapes—the only evidence not given to the jury. We find this "could have been" contention misplaced, for the judge made an anticipatory decision regarding these tapes at the charge confer-

---

**5.** Brief on Behalf of Appellee at 12, United States of America, *United States v. Hagmann,* No. 91–4031 (5th Cir.1991) (footnote omitted) [Appellee's Brief].

**6.** *See United States v. United States Gypsum Co.,* 438 U.S. 422, 460, 98 S.Ct. 2864, 2885, 57 L.Ed.2d 854 (1978) (reversal of conviction where judge's ex parte conversation with jurors

could have been taken as pressure to render verdict), *cert. denied,* 444 U.S. 884, 100 S.Ct. 175, 62 L.Ed.2d 114 (1979); *Rogers v. United States,* 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975) (error for court to inform jury ex parte it would accept verdict recommendation of "extreme mercy").

ence.[7] The judge also anticipated the jury's request and, along with the jury, informed the parties during jury instructions as to how he would respond to such a request.[8] Therefore, an opportunity to persuade the judge to include the tapes—the opportunity Hagmann alleges he was deprived of—actually came and passed *without objection*. Accordingly, we hold that this error is harmless. *See Brooks*, 786 F.2d at 643 (district court's response to jury's request for transcript of testimony of defendant and government witness in absence of defendant and his counsel was harmless error); *Breedlove*, 576 F.2d at 59–60 (judge's error in responding to jury in absence of defendant does not require reversal where judge is distinctly responsive to jury's inquiry, response clearly states the law, and defendant does not show any prejudice).

### B. The Court's Instruction to the Jury to Consider the Statements of "Other Proven" Co-conspirators

■ The breadth of a trial judge's discretion in formulating her jury charge is expansive and, accordingly, we are hesitant to disturb such a charge on appeal. *See United States v. Burroughs*, 876 F.2d 366, 369 (5th Cir.1989) (holding that refusal to give requested instruction was reversible error, acknowledging that "[t]he district court, of course, had substantial latitude in framing its instructions"); *Jordan v. Watkins*, 681 F.2d 1067, 1076 (5th Cir.1982) ("A trial judge is vested with 'broad discretion in formulating his charge and we will not lightly disturb his judgment.'") (citation

omitted), *cert. denied, Jordan v. Mississippi*, 488 U.S. 818, 109 S.Ct. 57, 102 L.Ed.2d 35 (1988). When a charge is challenged on appeal, we evaluate it in its entirety, looking to see whether the charge *as a whole* was correct. *See Jordan*, 681 F.2d at 1076 ("[A]ny prejudice that the general definition could have caused was eviscerated by the specific instruction that immediately followed."). Refusal to deliver a requested instruction may constitute reversible error only if that rejected instruction: "(1) was substantially correct; (2) was not substantially covered in the charge delivered to the jury; and (3) concerned an important issue so that the failure to give it seriously impaired the defendant's ability to present a given defense." *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir.1990) (concluding that "the judge acted within his substantial latitude in framing his jury instructions"), *cert. denied sub nom. Duncan v. United States*, — U.S. —, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1991) (citations omitted).

■ Hagmann requested the court to use the 1983 Fifth Circuit District Judges Association Pattern Instruction on Conspiracy.[9] The court refused and gave the following:

> In your consideration of the conspiracy offense as alleged in the indictment, you should first determine whether or not the conspiracy existed as charged. If you conclude that a conspiracy did exist as alleged, you should next determine whether or not the defendants under consideration knowingly and willfully became members of such conspiracy. In

---

7. Record on Appeal, vol. 21, at 913, *United States v. Placente and Hagmann*, No. 91–40031 (5th Cir.1991) [Record]:

> I will ... tell them that they are entitled to see any and all exhibits that have been received in evidence. But they are not permitted to play the tapes, and they are not permitted to have copies of the transcripts of the tapes because that is not evidence.

8. *Id.* at 1011–12:

> Now, the other thing I will tell you, that you are entitled to, and if you simply wish, you are entitled to receive all the exhibits received in evidence.... So a simple request from your foreperson, and I will see that you get what you request.

9. The requested instruction reads as follows:

> In determining whether a Defendant was a member of an alleged conspiracy, however, the jury should consider only that evidence, if any, pertaining to his own acts and statements. He is not responsible for the acts or declarations or other alleged participants until it is established beyond a reasonable doubt, *First*, that a conspiracy existed and, *Second*, from evidence of his own acts and statements, that the defendant was one of its members.

United States Fifth Circuit District Judges Association, Pattern Jury Instructions—Criminal Cases at 63 (1983) (emphasis in original).

determining whether a conspiracy did exist, and if so, whether either or both of the defendants knowingly and willfully became members of such a conspiracy, you may consider all of the evidence which I have admitted in this case. That is, in addition to considering the acts and statements of the defendants themselves, you may consider acts and statements made and done during and in furtherance of the conspiracy by *any other proven member of the conspiracy*, even though the defendant may not have been present to hear the statement made or see the act done. This is true, because as stated earlier, a conspiracy is a kind of partnership, so that under the law each member is an agent or partner for every other member. And each member is bound by or responsible for the acts and statements of every other member made in pursuance of the unlawful scheme.[10]

The instruction requested by Hagmann—an instruction drafted pursuant to *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973)—no longer accurately stated the law.[11] The district court, after making a preliminary determination under Rule 104(a) of the Federal Rules of Evidence that the acts and declarations of co-conspir-

ators offered against Hagmann were admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence, attempted to instruct the jury that it could consider these admitted 801(d)(2)(E) statements to reach its verdict. *See Bourjaily v. United States*, 483 U.S. 171, 180, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 ("We think that there is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy."). Since Hagmann's proposed instruction was not "substantially correct," we find that the district court's refusal to submit it does not constitute reversible error. *See Duncan*, 919 F.2d at 990; *Burroughs*, 876 F.2d at 369.

Hagmann also asserts that, though the court determines the admissibility of 801(d)(2)(E) statements, only the jury may weigh the importance of that evidence—that is, a judge may not make any suggestion as to whether such a statement shows beyond a reasonable doubt that the charged conspiracy existed and that the defendant willfully became a member of it. We agree. *See United States v. Benavides*, 549 F.2d 392, 393 (5th Cir.1977) (re-

---

10. Record, vol. 21, at 997–98 (emphasis added).

11. In *Apollo*, this court noted a trial judge's obligation "to give a cautionary instruction on the limited uses of hearsay testimony, explaining clearly to the jury the requirement that the conspiracy itself and each defendant's participation in it *must be established by independent non-hearsay evidence....*" *Id.* at 163 (emphasis added). However, the Federal Rules of Evidence were enacted in 1975, rule 104(a) providing in part that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court...." To reflect this significant change in the law, this court overruled *Apollo* in *United States v. James*, 590 F.2d 575, 579–80 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979):

> Rule 104 has now made it clear that we must revise the procedures adopted in *Apollo* for testing the trustworthiness of coconspirator statements—that is for determining whether a conspiracy existed and whether the defendant and the declarant were members of it.... [W]e hold that Rule 104(a) requires that the judge alone make the determination of the admissibility of the evidence. The jury is to

play no role in determining the admissibility of the statements.

*Id.* at 579–80. Once a trial judge makes a preliminary determination under rule 104(a) that the requirements of rule 801(d)(2)(E) (conspiracy exception to hearsay rule) have been satisfied, there is no reason to instruct the jury that it is required to make an identical determination independently of the court: whether such a statement can be considered at all is for the court alone to determine. *See United States v. Elam*, 678 F.2d 1234, 1249–50 (5th Cir.1982) (once trial judge has correctly determined that prosecution has established preliminary facts required by rule 801(d)(2)(E), such an instruction "[is] properly refused"; *accord United States v. Ascarrunz*, 838 F.2d 759, 762 (5th Cir. 1988) ("Having made its preliminary determination[,] the district court need not consider an instruction to the jury."), *citing Elam*, 678 F.2d at 1249–50. It should also be noted that the pattern jury instruction on conspiracy drafted in 1990 by the Fifth Circuit District Judges Association does not contain the instruction requested here by defense counsel. *See generally* United States Fifth Circuit District Judge Association, Pattern Jury Instructions—Criminal Cases at 89–90 (1990).

versal of conviction on grounds that judge's message to a deadlocked jury—"Take a recess and consider the offense further"—was commentary regarding weight of evidence in that it carried implication that court thought defendant guilty of the charge).

Our agreement with Hagmann on this issue ends there. Hagmann contends that the judge instructed the jury that he believed that Hagmann had already been proven to be a member of the conspiracy. Considering the court's charge as a whole, we disagree. Again, the court instructed the jury to "first determine whether or not the conspiracy existed as charged. If you conclude that a conspiracy did exist as alleged, you should next determine whether or not the defendant under consideration knowingly and willfully became members of such conspiracy." Although the "any other proven member of the conspiracy" that followed was poorly drafted, we do not find that the charge, taken as a whole, constitutes reversible error.[12]

## C. The Failure of Count V of the Indictment to Allege Two Elements of the Offense

The essential elements of the Travel Act, 18 U.S.C.A. § 1952 (1984 & Supp.1991) (emphasis added), are:

12. The court then instructed the jury to consider "all of the evidence which I have admitted in this case." That is, the jury could consider not only "the acts and statements of the defendants themselves," but also the "acts and statements made and done ... by any other proven member of the conspiracy[.]" The court went on to explain that "a conspiracy is a kind of partnership, so that under the law each member is an agent or partner for every other member," recalling that other conspirators—who had already pled guilty—testified at trial. *See supra* Part I (summarizing details of conspiracy and testimony of co-conspirators); *see also supra* note 10 and accompanying text (quoting and discussing jury instructions).

13. The express language of the Travel Act is:
(a) Whoever travels in interstate ... commerce ... with intent to—
*   *   *   *   *   *
(3) ... promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be [punished].

(i) *travel* in interstate or foreign commerce, or use of the mail (or any facility) in interstate or foreign commerce;

(ii) with the specific *intent* to promote, manage, establish, or carry on—or distribute the proceeds of—unlawful activity; and

(iii) knowing and willful *commission of an act* in furtherance of that intent subsequent to the act of travel.[13]

*See United States v. Hernandez–Palacios,* 838 F.2d 1346, 1350 (5th Cir.1988); *United States v. Carrion,* 809 F.2d 1120, 1127 (5th Cir.1987); *United States v. Cauble,* 706 F.2d 1322, 1351 (5th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984). Hagmann alleges that Count V of his indictment was defective for failing to allege either an overt act subsequent to the prohibited travel or that the "unlawful activity" in question involved any "business enterprise"—an essential element of the offense.[14]

■ An indictment's most basic purpose—a fundamental objective that *must* be realized—is "to fairly inform a defendant of the charge against him." *United States v. Gordon,* 780 F.2d 1165, 1169 (5th Cir.1986). "Under Fifth Circuit jurispru-

(b) As used in this section "unlawful activity" means (1) any business enterprise involving ... narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act) ... offenses in violation of the laws of the State in which they are committed or of the United States....

14. Count V of the indictment against Hagmann alleges that
[o]n or about February 6, 1988, in the Western District of Louisiana, and elsewhere, [the] Defendants ... did travel in interstate commerce and cause the travel in interstate commerce from other states to the State of Louisiana, with the specific intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, said unlawful activity being the knowing, intentional, importation and possession with intent to distribute marijuana, a schedule I non-narcotic controlled substance, ... in violation of Title 18, United States Code, Section 1952 [ (a) ](3). Record Excerpts for the Appellant Robert F. Hagmann at 43, *United States v. Hagmann,* No. 91–4031 (5th Cir. filed June 21, 1991) [Record Excerpts].

dence, an indictment is sufficient if it [1] contains the elements of the offense charged and [2] fairly informs a defendant of the charge against him[,] and [3] enables him to plead acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Stanley,* 765 F.2d 1224, 1239 (5th Cir.), *reh'g denied, United States v. Spiszak,* 772 F.2d 904 (1985); *see also Gordon,* 780 F.2d at 1169. As long as the statutory language of the charged offense unambiguously sets out all the necessary elements, an indictment setting forth the offense in the words of the statute itself is generally sufficient. *See Gordon,* 780 F.2d at 1169. "Because the Travel Act fully and unambiguously sets out the essential elements of the offense, indictments drafted substantially in its language are sufficient." *Stanley,* 765 F.2d at 1240, *citing United States v. Cauble,* 706 F.2d at 1351.

■ Count V of the indictment against Hagmann fails to allege an overt act subsequent to the act of travel. Although an indictment need not set forth the specific act or conduct in question, *Stanley,* 765 F.2d at 1239–40, two sister circuits have found that an indictment's failure to at least generally allege that an overt act took place is fatal. *See, e.g., United States v.*

*Wander,* 601 F.2d 1251, 1258–59 (3d Cir. 1979) (citation omitted); *United States v. Hayes,* 775 F.2d 1279, 1282–83 (4th Cir. 1985). However, the case before us most closely resembles *United States v. Esposito,* 771 F.2d 283 (7th Cir.1985), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1187, 89 L.Ed.2d 302 (1986).[15] In *Esposito,* although the Travel Act counts failed to allege an overt act subsequent to the act of travel, the necessary overt acts "occurring after the interstate travel were included in other counts in the same indictment and must necessarily have been found beyond a reasonable doubt on the other counts." *Esposito,* 771 F.2d at 289.[16]

Count V of the indictment against Hagmann is clearly the product of sloppy draftsmanship—a practice this court does not condone. We expect that this issue will not arise again. Nevertheless, Hagmann has raised his challenge to Count V for the first time on appeal, and, although "an objection that an indictment fails to state an offense can be raised at any time during the pendency of the proceedings,"[17] "judicial efficiency requires that tardily challenged indictments be construed in favor of validity." *See United States v. Watkins,* 709 F.2d 475, 478 n. 2 (7th Cir.1983) (citation omitted). The element missing from the Travel Act count was charged in other

**15.** In his Reply Brief, Hagmann contends that "all the arguments advanced in *Esposito* are considered and completely refuted in *United States v. Hooker,* 841 F.2d 1225 (4th Cir.1988) (en banc)." Reply Brief for Appellant Robert F. Hagmann at 4, *United States of America v. Robert F. Hagmann,* No. 91–4031 (5th Cir. filed Jul. 31, 1991) [Reply Brief]. We note that the *Hooker* holding is the harvest of Fourth—not Fifth—Circuit law. *See Hooker,* 841 F.2d at 1227–28 (looking to the language of the indictment and not the statutory citation within that indictment "has for long been the consistent rule in this Circuit" and "it is the rule in all the states of this Circuit with a single exception.") (citations omitted). Although we do not completely reject the principles undergirding *Hooker,* this circuit does look to the statutory language of the charged offense when considering the sufficiency of an indictment. *See generally Gordon,* 780 F.2d at 1165. The charged violation in our case, as in *Esposito,* involves the Travel Act—a statute lucidly drafted. In contrast, the charged offense in *Hooker* was a violation of RICO, which, as the United States Supreme Court and this court

have noted, lacks such lucidity. *See generally H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *id.* 109 S.Ct. at 2907 (Scalia, J., concurring, joined by Rehnquist, C.J., O'Connor, and Kennedy, JJ.) ("Today, four years and countless millions in damages and attorneys' fees later (not to mention prison sentences under the criminal provisions of RICO), the Court does little more than repromulgate those hints as to what RICO means, though with the caveat that Congress intended that they be applied using a 'flexible approach'.") (citation omitted); *see also Abell v. Fryar,* 946 F.2d 1160 (5th Cir.1991).

**16.** The *Esposito* court concluded that "vacating the convictions and ordering the counts dismissed would be an extreme example of technicality, unnecessary to protect the rights of the defendants." *Id.*

**17.** *United States v. Oberski,* 734 F.2d 1034, 1035 (5th Cir.1984), *cert. denied,* 469 U.S. 1113, 105 S.Ct. 797, 83 L.Ed.2d 790 (1985), *citing* Fed. R.Crim. P. 12(b)(2) (citation omitted).

counts: Counts III [18] and IV [19] of the indictment charge importation of controlled substances and possession of controlled substances with intent to distribute.[20] The violations alleged in Counts III–V occurred on or about February 6, 1988, and the evidence makes clear that the importation and possession with intent to distribute took place after the interstate travel. Also, the court correctly charged the jury that the government was required to prove an overt act subsequent to the travel,[21] and, by convicting defendants of Counts III and IV, the jury found that the necessary act took place beyond a reasonable doubt. Hagmann, fully informed of the charges against him, suffered no surprise and the missing element was not jurisdictional.[22] Accordingly, we hold that "[r]eindictment and retrial on the Travel Act counts here ... would be a pure waste of energy be-

**18.** Record Excerpts at 41 (Indictment at 2):

On or about February 6, 1988, in the Western District of Louisiana, and elsewhere, Defendants ... and other persons known and unknown to the grand jury, each knowingly and intentionally aided and abetted one by the other, did knowingly and intentionally and unlawfully import, and caused to be imported into the United States of America from a place outside thereof, approximately seven (7) tons of marijuana, a schedule I non-narcotic controlled substance, all in violation of Title 21, United States Code, Section 952(a) and Title 18, United States Code, Section 2. [21 U.S.C. § 952(a) and 18 U.S.C. § 2].

**19.** Id. at 42 (Indictment at 3):

On or about February 6, 1988, in the Western District of Louisiana, and elsewhere, Defendants ... and other persons known and unknown to the grand jury, each knowingly and intentionally aided and abetted one by the other, did knowingly and intentionally and unlawfully possess with intent to distribute and caused to be possessed with intent to distribute, approximately seven (7) tons of marijuana, a schedule I non-narcotic controlled substance, all in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2. [21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2].

**20.** Hagmann also alleges that the Travel Act count is defective because it fails to allege a "business enterprise." The indictment does allege, however, that defendants were engaged in an unlawful activity ("importation of marijuana and possession with intent to distribute marijuana ... are unlawful activities within the meaning of [§ 1952(a)(3),]" Record, vol. 21, at 1003), and "unlawful activity" is a term of art defined by the Travel Act to include "any business enterprise involving ... narcotics or controlled substances...." 18 U.S.C. § 1952(b). Therefore, by charging an unlawful activity, the indictment alleges the "business enterprise" element of the offense. *See United States v. Hernandez–Palacios,* 838 F.2d 1346, 1350 (5th Cir.1988) ("The term 'unlawful activity' means 'any business enterprise involving ... narcotics or controlled substances....'") (citation omitted).

**21.** Record, vol. 21, at 1003–04:

You are further instructed that in order to establish the offense charged in Count Five, the Government must prove each of the following essential elements beyond a reasonable doubt. One, that the defendants traveled or aided and abetted the travel in interstate commerce on or about the time and between the places charged in the indictment. Second, that the defendant aided and abetted such travel with the specific intent to promote, manage, establish, or carry on an unlawful activity, as defined herein. And three, that the defendants thereafter knowingly and willfully committed an act to promote, manage, establish or carry on such unlawful activity. Otherwise, you should return a verdict of not guilty as to that count.

Hagmann also asserts that the district court's jury instructions "repeated the indictment's omission of the 'business enterprise' requirement," and that this omission constitutes plain error. Appellant's Brief at 25. Defense counsel did not object to this instruction at trial, and "[w]here an objection to a jury instruction is raised for the first time on appeal, even an inaccurate instruction will be upheld absent 'plain error.'" *United States v. Gammage,* 790 F.2d 431, 434 (5th Cir.1986) (citation omitted); *see also United States v. Branch,* 850 F.2d 1080, 1083 (5th Cir.1988), *cert. denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 806 (1989). Moreover, in evaluating whether the instructions constituted plain error, it is appropriate to "evaluate the strength or weakness of the evidence against the defendants on the Travel Act." *See United States v. Tarantino,* 846 F.2d 1384, 1401–03 (D.C.Cir.), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988), *cert. denied, Burns v. United States,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988) (citation omitted). The evidence against Hagmann is overwhelming, and the jury could only understand the instruction to refer to the elaborate scheme to import and sell nearly seven tons of marijuana from Colombia. Therefore, we find that the court's failure to include an instruction on "business enterprise" does not constitute plain error.

**22.** *See United States v. Hooker,* 841 F.2d 1225, 1232 (4th Cir.1988) ("The absence of prejudice to the defendant in a traditional sense does not cure a substantive, jurisdictional defect in an indictment.") (citation omitted).

cause [Hagmann] would not thereby be afforded any protection of [his] rights which was not afforded in the first trial." *Esposito,* 771 F.2d at 289.

### D. Hagmann's $280,823.80 Fine

In addition to his sentence of 144 months of imprisonment, the district court imposed a $280,823.80 fine upon Hagmann. This total comprises a $100,000 fine determined under section 5E1.2(c)(3) of the United States Sentencing Commission Guidelines ("U.S.S.G."), plus $180,823.80 for cost of imprisonment and supervision. According to Hagmann, the fine violates the law because: (i) the district court failed to consider his ability to pay, and (ii) the cost-of-imprisonment fine provided for by section 5E1.2(i) violates the Sentencing Reform Act and is unconstitutional.

#### i. Hagmann's Inability to Pay

Section 3572(a)(1) of Title 18 states, in pertinent part, "[i]n determining whether to impose a fine, and the amount ... the court *shall* consider in addition to the factors set forth in section 3553(a)—the defendant's income, earning capacity, and financial resources." 18 U.S.C.A. § 3572(a)(1) (Supp.1991) (emphasis added). Hagmann contends that the sentencing judge erred by failing to consider his inability to pay a fine and that, "[b]ecause the record does not reflect that the Court had considered the relevant factors, nor that the defendant had the ability to pay a fine, the judgment of fine must be vacated." Brief for the Appellant Robert F. Hagmann at 27, *United States v. Hagmann,* No. 91–4031 (5th Cir. filed June 21, 1991) [Appellant's Brief].

This court "will affirm a sentencing court's factual findings, *unless clearly erroneous,* and typically accord deference to its application of the Guidelines." *United States v. Perez,* 897 F.2d 751, 752–53 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct.

177, 112 L.Ed.2d 141 (1990) (emphasis added) (citations omitted). Moreover, "when the record demonstrates that the judge considered [ability to pay] before imposing the fine, the appellate court will not reverse the fine merely because no express finding was made but will review the finding of ability to pay necessarily implied by such consideration." *United States v. Mastropierro,* 931 F.2d 905, 906 (D.C.Cir.1991) (citations omitted); *see also United States v. Matovsky,* 935 F.2d. 719, 722 (5th Cir. 1991) (holding that "the guidelines have placed the burden on the defendant to present evidence on [sentencing guideline] factors, particularly his inability to pay.").

The need to reflect the seriousness of the offense; the need to provide just punishment for the offense; the need to afford adequate deterrence to criminal conduct; the kinds of sentences available—one's ability to pay is not the only criterion prescribed by section 3553(a) for determining the amount of a fine. *See generally* 18 U.S.C.A. § 3553(a) (1985 & Supp.1991). The maximum statutory fine provided by Congress for the offenses under which Hagmann was convicted is $4 million. *See* 21 U.S.C.A. § 960(b)(1)(G) (1981 & Supp. 1991). Hagmann was only fined a fraction of that amount, which—along with the fact that the court waived the requirement that Hagmann pay interest—implies that the court considered Hagmann's ability to pay. *See* Supp. Record on Appeal, vol. 1, at 23, *United States v. Hagmann,* No. 91–4031 (5th Cir. filed May 10, 1991). In short, Hagmann was convicted of importing nearly seven *tons* of marijuana into the United States from Colombia. Beyond the seriousness of the offense and the need for deterrence in such a large-scale drug conspiracy, the court had reason to believe that Hagmann had access to funds exceeding those he voluntarily listed in his forma pauperis affidavit.[23] Moreover, this court has held that a "defendant's indigency *at the time restitution is ordered* is not a bar to the

---

23. Several people involved in the conspiracy were advanced large sums of money for their services, and they expected even greater returns if the operation was a success. For example, Fred Miller, the boat captain turned confidential informant, was advanced $44,000 and ad-

vised to request $44,000 when the marijuana was delivered. Record, vol. 19, at 553, 570–576. John McKibbin, a co-defendant, testified that he expected to receive $1 million for acting as the intermediary between Hagmann and Lomax Smith, a financier. Record, vol. 17, at 171.

requirement of restitution." *United States v. Ryan,* 874 F.2d 1052, 1054 (5th Cir.1989) (emphasis added); *see also United States v. Brown,* 744 F.2d 905, 911 (2d Cir.), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984) ("Financial obligations may be imposed upon a defendant who is indigent at the time of sentencing but subsequently acquires the means to discharge the obligations") (citation omitted). Accordingly, we find that the fine imposed by the court is not clearly erroneous.

### ii. The Cost-of-Imprisonment Fine

■ Hagmann also contends that the cost-of-imprisonment fine imposed on him under section 5E1.2(i) is unconstitutional and violates the Sentencing Reform Act. More specifically, Hagmann asserts that the guideline, which appropriates a fine based on the cost of imprisoning the defendant,[24] is contrary to the Sentencing Reform Act's mandate that the guidelines be consistent with the purposes of sentencing set forth at section 3553(a)(2) of Title 18. *See* 18 U.S.C.A. § 3572(a) (Supp.1991). According to Hagmann, "an 'additional fine amount' under section 5E1.2(i) imposes punishment that is 'greater than necessary'

to satisfy the goals set forth in § 3553(a)(2), as supplemented by § 3572(a)." [25]

We agree with Hagmann that the Sentencing Commission was mandated to formulate guidelines consistent with the purposes set forth at section 3553(a)(2).[26] We do not agree, however, that these purposes are wholly realized by the fine table and that the section 5E1.2(i) addition to this sum renders the overall fine excessive.[27] In developing the appropriate mechanism by which the proper fine in a given case is calculated, the Commission developed a two-level system: the court must first look to the fine table to determine the initial range and then complete its calculation by looking to the cost of imprisonment. Indeed, section 5E1.2(b) makes specific reference to the fine table and informs the sentencing court that both provisions are applicable.[28] *Together,* these calculations comprise the Commission's effort to realize section 3553(a)(2)'s goals.

■ Hagmann also contends that the cost-of-imprisonment fine is irrational—so irrational, in fact, that it amounts to a deprivation of property without due process of law in violation of the Fifth Amendment—in that, although the fine is calculated by reference to the cost of imprisonment, the funds collected are actually ex-

---

**24.** U.S.S.G. § 5E1.2(i):

Notwithstanding the provisions of subsection (c) of this section, but subjective to the provisions of subsection (f) herein, the court shall impose an additional fine amount that is at least sufficient to pay the costs to the government of any imprisonment, probation, or supervised release ordered.

**25.** Appellant's Brief at 29.

**26.** These purposes are:

(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C.A. § 3553(a) (1985 & Supp.1991). In addition to these goals, Congress provided another six (seven in the case of an organizational defendant) considerations for the court's determination of a fine amount: (i) the defendant's finances, (ii) hardship to dependents, (iii) pecuniary loss to victims, (iv) restitution, (v) deprivation of illegal gains, and (vi) the ability to pass on the cost of any fine. *See* 18 U.S.C.A. § 3572(a) (Supp.1991).

**27.** Hagmann would, presumably, accept a fine table carrying significantly higher ranges within the statutory maximum but omitting the cost-of-imprisonment calculation.

**28.** U.S.S.G. § 5E1.2(b) (Nov. 1, 1988):

(b) Except as provided in subsections (f) and (i) below, or otherwise required by statute, the fine imposed shall be within the range specified in subsection (c) below. If, however, the guideline for the offense in Chapter Two provides a specific rule for imposing a fine, that rule takes precedence over subsection (c) of this section.

pended on unrelated functions.[29] Although Hagmann is correct about how this money is distributed, we do not agree that it was irrational for the Sentencing Commission to develop a guideline that uses the government's cost for incarcerating or supervising a convicted criminal as part of the calculation to determine that convicted criminal's fine. This court has held that "[d]ue process requires that information relied upon when determining an appropriate sentence have some 'minimal indicium of reliability' and bear 'some rational relationship' to the decision to impose a particular sentence." *United States v. Angulo*, 927 F.2d 202, 204 (5th Cir.1991) (citation omitted). Once convicted, criminals impose a dual financial cost upon society—both the price of their imprisonment and the expense of trying to alleviate some of the personal cost inflicted upon their victims. Criminals' terms of imprisonment generally reflect, among other things, the seriousness of their crimes and the harm they have inflicted upon their victims. We find, therefore, that the uniform practice of fining criminals on the basis of their individualistic terms of imprisonment—an indicator of the actual harm each has inflicted upon society—is a rational means to assist the victims of crime collectively.

### III.

For the foregoing reasons, we AFFIRM.

---

**29.** Pursuant to 42 U.S.C. § 10601(c)(1)(B), criminal fines are deposited into the Treasury's Crime Victim Fund up to a maximum of $150 million per fiscal year. The first $2.2 million of any excess goes to the judicial branch for administrative costs, and the remainder goes to the Treasury's general fund. The fact that the monies collected on the basis of the cost of imprisoning a given criminal are expended to generally benefit the victims of crime and realize the goals of 18 U.S.C. § 3553(a) also snuffs out another of Hagmann's arguments: section 5E1.2(i) is not premised on the legislative intent of having a criminal pay part or all of the cost of his or her own confinement. *See* Appellant's Brief at 31:

In 1988 Congress enacted a law requiring the Sentencing Commission "to study the feasibility" of having federal prisoners pay part or all of the cost of their confinement. Pub.L. [No.] 100–690, § 7301, 100th Cong., 2d Sess., 102 Stat. 4463. There could hardly be clearer evidence that Congress had not, in the Sentencing Reform Act of 1984, already authorized the levying of "additional fine amounts" for such purposes. Only by treating that legislation on point as entirely nugatory can U.S.Sent.Comm'n Guideline § 5E1.2(i) be supported.